ADAM L. BRAVERMAN
United States Attorney
BRETT NORRIS
Assistant U.S. Attorney
Cal. State Bar No. 224875
PAUL L. STARITA
Assistant U.S. Attorney
Cal. State Bar No. 219573
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 546-7620/7701
Facsimile: (619) 546-7751
Email: brett.norris@usdoj.gov
Email: paul.starita@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES WOOD, an individual; IMPERIAL VALLEY CONSERVATION RESEARCH CENTER COMMITTEE, INC. dba IMPERIAL VALLEY CONSERVATION RESEARCH CENTER, a California Corporation; CHRISTOPHER BOUCHER, an individual; FARMTIVA INC., a California corporation; COUNTY OF IMPERIAL, a political subdivision of the State of California; STEVEN DAHM, an individual; and DOES 1 THROUGH 100,<br><br>Defendants. | Case No.: '18CV2408 JLS  BGS<br><br>**UNITED STATES OF AMERICA'S COMPLAINT FOR**<br>**(1) DECLARATORY RELIEF;**<br>**(2) TEMPORARY, PRELIMINARY, AND PERMANENT INJUCTIVE RELIEF; AND**<br>**(3) CIVIL PENALTIES** |

# I

# INTRODUCTION

1.     The Controlled Substances Act ("CSA") makes it illegal to grow, distribute, or possess the "*Cannabis sativa L.*" plant (a.k.a. marijuana).  21 U.S.C. § 812(c) (Schedule I(c)(10), (17)).  The Agricultural Act, however, creates a limited exception to the CSA.  7

U.S.C. § 5940.  It permits the growth of "industrial hemp" (a *Cannabis sativa L.* plant), but only if, among other things, the grower is an institution of higher education or a State department of agriculture.  *Id.*  But even institutions of higher education and State agricultural departments are not automatically entitled to grow industrial hemp – they must first obtain a certificate of registration from the Attorney General. 21 U.S.C. §§ 822–23.

2.    In 2018, James Wood ("WOOD"), the director of the Imperial Valley Conservation Research Center Committee, Inc. dba Imperial Valley Conservation Research Center ("IVCRC"), and Christopher Boucher ("BOUCHER"), the Chief Executive Officer of Farmtiva, Inc., executed a Memorandum of Understanding ("M.O.U.") for the purpose of growing "industrial hemp" in Imperial County.  (*See* Exhibit 1 hereto.)  Afterwards, WOOD and BOUCHER – by and through IVCRC and FARMTIVA – began planting, growing, and harvesting hemp on land owned by Imperial County ("the COUNTY"), and on land owned by Steven Dahm ("DAHM").

3.    Neither WOOD, IVCRC, BOUCHER, FARMTIVA, the COUNTY, nor DAHM (collectively "Defendants") is qualified to grow industrial hemp under the Agricultural Act's exception because none is an institution of higher education or a State department of agriculture.   Additionally, even if Defendants were qualified to grow industrial hemp under the Agricultural Act (they are not), none have obtained a certificate of registration from the Attorney General allowing them to manufacture industrial hemp.

4.    The United States of America ("United States") brings this action against the Defendants – and all those acting in concert with them – under the CSA and other related federal statutes and federal law, for declaratory relief, a temporary restraining order, preliminary and permanent injunctive relief, asset forfeiture, and civil penalties and damages arising out of the Defendants' ongoing manufacture, possession, and distribution of hemp, a Schedule I controlled substance, and possession of hemp with the intent to manufacture and distribute the substance in violation of 21 U.S.C. § 841(a)(1); and for Defendants' ongoing conspiracy to violate the CSA, in violation of 21 U.S.C. § 846.

5.     The United States also seeks temporary, preliminary, and permanent injunctive relief against Defendants pursuant to Fed. R. Civ. P. 65 and 21 U.S.C. §§ 843(f), 856(e), 882(a).

6.     The United States also seeks remedies and damages against Defendants relating to civil and other types of forfeiture pursuant to 18 U.S.C. §§ 981, *et seq.*, and 21 U.S.C. § 881.

7.     The United States also seeks civil penalties and damages against Defendants pursuant to 21 U.S.C. § 856(d).

## II

## JURISDICTION AND VENUE

8.     This action arises out of violations of 21 U.S.C. § 801, *et seq.*; 21 U.S.C. §§ 843(f), 856(e), 882(a), which authorize temporary, preliminary, and permanent injunctive relief; 28 U.S.C. §§ 2201 and 2202 which authorize declaratory relief; 18 U.S.C. §§ 981, *et seq.*, and 21 U.S.C. § 881 which authorize civil forfeiture; and 21 U.S.C. § 856(d) which authorizes civil penalties and damages for the violations of the Act alleged herein.

9.     This court has jurisdiction pursuant to 18 U.S.C. §§ 981, 985; 21 U.S.C. §§ 881, 882(a); and 28 U.S.C. §§ 1331, 1345, and 1355.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b).

## III

## PARTIES

11.     The Plaintiff is the United States.

12.     Defendant WOOD, an individual residing in Imperial County, California, is the director and/or agent of the IVCRC.  The Schedule I controlled substance that is the subject of this action has been grown, manufactured, and produced by WOOD in Imperial County.

//

//

13.     Defendant IVCRC is a California Corporation operating in Imperial County, California.  The Schedule I controlled substance that is the subject of this action has been grown, manufactured, and produced by IVCRC in Imperial County.

14.     Defendant BOUCHER, an individual residing in Orange County, California is the chief executive officer and/or agent of FARMTIVA.  The Schedule I controlled substance that is the subject of this action has been grown, manufactured, and produced by BOUCHER in Imperial County.

15.     Defendant FARMTIVA is a California Corporation operating in Imperial County, California.  The Schedule I controlled substance that is the subject of this action has grown, manufactured, and produced by FARMTIVA in Imperial County.

16.     Defendant the COUNTY is a political subdivision of the State of California. A portion of the Schedule I controlled substance that is the subject of this action has been grown, manufactured, and produced on property owned and/or controlled by the COUNTY in Imperial County.

17.     Defendant DAHM is an individual landowner in Imperial County.  A portion of the Schedule I controlled substance that is the subject of this action has been grown, manufactured, and produced on property owned and/or controlled by DAHM in Imperial County.

## IV

## LEGAL BACKGROUND—THE CONTROLLED SUBSTANCES ACT

18.     The Controlled Substances Act ("CSA"), 21 U.S.C. § 801, *et seq.*, establishes a comprehensive federal scheme to regulate controlled substances.  The CSA makes it unlawful to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" any controlled substance, "[e]xcept as authorized by [21 U.S.C. §§ 801–904]." 21 U.S.C. § 841(a)(1).    Under the CSA, "manufactur[ing]" includes "production," 21 U.S.C. § 802(15), which includes "planting, cultivation, growing, or

4

harvesting" a controlled substance, 21 U.S.C. § 802(22).  The CSA makes it a crime to possess any controlled substance except as authorized by the CSA.

19.     The CSA establishes "a 'closed' system of drug distribution for legitimate handlers" of controlled substances.  H.R. Rep. No. 91–1444, at p. 6 (1970), as reprinted in 1970 U.S.C.C.A.N. 4566, 4571–72.  To effectuate that closed system, the CSA "authorizes transactions within 'the legitimate distribution chain' and makes all others illegal."  *United States v. Moore*, 423 U.S. 122, 141 (1975) (quoting H.R. Rep. No. 91–1444 (1970)).  The restrictions the CSA places on the manufacture, distribution, and possession of a controlled substance depend upon the "schedule" in which the drug has been placed.  *See* 21 U.S.C. §§ 821–29.

20.     The CSA establishes five "schedules" of controlled substances differentiated by the scheduled drug's potential for abuse, its usefulness in medical treatment, and the potential consequences if abused. 21 U.S.C. § 812(b).  A controlled substance is listed in Schedule I, the most restrictive schedule, if it has "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use . . . under medical supervision."  21 U.S.C. § 812(b)(1).  Under the CSA, any person who seeks to manufacture, distribute, or possess a Schedule I controlled substance must apply for and obtain a certificate of registration from the Attorney General. 21 U.S.C. §§ 822–23.  When evaluating an application to manufacture a Schedule I substance, the Attorney General is required to consider such factors as the applicant's "maintenance of effective controls against diversion," "past experience in the manufacture of controlled substances," and criminal history.  21 U.S.C. § 823(a).

21.     Since Congress enacted the CSA in 1970, "marijuana" (or "marihuana") and tetrahydrocannabinols (THC) have been classified as Schedule I controlled substances.  *See* Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, § 202, 84 Stat. 1249 (schedule I(c)(10), (17)); 21 U.S.C. § 812(c) (Schedule I(c)(10), (17)). "Marijuana" is defined under the CSA to include "all parts of the plant *Cannabis sativa L.*"

except certain components of the plant such as mature stalks, fiber produced from the stalks, sterilized seeds, and oil from the seeds. 21 U.S.C. § 802(16).  (Italics added.)

22.    The CSA contains congressional findings regarding the effects of drug distribution and use on the public health and welfare, and the effects of drug activity on interstate commerce. Congress found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."  21 U.S.C. § 801(2).  Congress then found:

> (3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because--
>
> (A) after manufacture, many controlled substances are transported in interstate commerce,
>
> (B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and
>
> (C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

21 U.S.C. § 801(3).

23.    Congress further found that "[l]ocal distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances."  21 U.S.C. § 801(4); that "[c]ontrolled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate" and "[t]hus, it is not feasible to distinguish" between such substances "in terms of controls," 21 U.S.C. § 801(5); and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic."  21 U.S.C. § 801(6).

24.    Under the CSA, marijuana is designated as a Schedule I controlled substance. 21 U.S.C. § 812 (Schedule I)(c)(10).  The CSA defines "marijuana" as follows:

> [A]ll parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16). This definition of "marijuana" unambiguously includes the *Cannabis sativa L.* plant and does not in any manner differentiate between Cannabis plants based on their THC concentrations. Although the definition does exclude certain components of the plant, a growing Cannabis plant falls within the definition of "marijuana."

25. In addition, the CSA designates "any material . . . which contains any quantity of ... [t]etrahydrocannabinol[ ][THC]" as a Schedule I controlled substance. 21 U.S.C. § 812 (Schedule I)(c)(17). *See also* 21 U.S.C. § 881(g)(1) ("All species of plants from which controlled substances in schedules I and II may be derived which have been planted or cultivated in violation of this subchapter ... may be seized and summarily forfeited to the United States").

26. The CSA makes no distinction between cannabis grown for drug use and that grown for industrial use. 21 U.S.C. § 802(16). *See also United States v. Sifuentes*, 504 F.2d 845, 849 (4th Cir. 1974) (the CSA applies to all species of cannabis). "Industrial" or "commercial" hemp is subject to regulation as a Schedule I controlled substance under the CSA because, as a species of *Cannabis sativa L.*, it falls squarely within the definition of marijuana set forth in the CSA. The language of the CSA unambiguously bans the growing of marijuana, regardless of its use. The legislative history of the CSA makes it clear that the CSA bans the growth of all varieties of the *Cannabis sativa L.* plant absent compliance with the registration requirements of the CSA. *See Monson v. Drug Enforcement Administration*, 589 F.3d 952, 961-62 (8th Cir. 2009).

//

//

//

V

## LEGAL BACKGROUND—THE LIMITED EXCEPTION CREATED BY THE AGRICULTURE ACT OF 2014

27.     In the Agricultural Act of 2014, Congress created a limited exception to the CSA.  That exception allows states to enact laws allowing certain institutions of higher education and state departments of agriculture to grow or cultivate "industrial hemp" for research purposes or as part of an agricultural pilot program in which the "industrial hemp" is grown for agricultural or academic research.  This exception, which is codified at 7 U.S.C. § 5940, states:

(a) In general

Notwithstanding the Controlled Substances Act (21 U.S.C. 801 *et seq*.), chapter 81 of Title 41, or any other Federal law, an institution of higher education (as defined in section 1001 of Title 20) or a State department of agriculture may grow or cultivate industrial hemp if—

(1) the industrial hemp is grown or cultivated for purposes of research conducted under an agricultural pilot program or other agricultural or academic research; and

(2) the growing or cultivating of industrial hemp is allowed under the laws of the State in which such institution of higher education or State department of agriculture is located and such research occurs.

(b) Definitions

In this section:

(1) Agricultural pilot program

The term "agricultural pilot program" means a pilot program to study the growth, cultivation, or marketing of industrial hemp--

(A) in States that permit the growth or cultivation of industrial hemp under the laws of the State; and

(B) in a manner that--

(i) ensures that only institutions of higher education and State departments of agriculture are used to grow or cultivate industrial hemp;

(ii) requires that sites used for growing or cultivating industrial hemp in a State be certified by, and registered with, the State department of agriculture; and

8

(iii) authorizes State departments of agriculture to promulgate regulations to carry out the pilot program in the States in accordance with the purposes of this section.

(2) Industrial hemp

The term "industrial hemp" means the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.

(3) State department of agriculture

The term "State department of agriculture" means the agency, commission, or department of a State government responsible for agriculture within the State.

*Id.* Additionally, 20 U.S.C. § 1001 defines "institution of higher education" as an educational institution in any State that:

(1) admits as regular students only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate; or persons who meet the requirements of section 1091(d) of this title;

(2) is legally authorized within such State to provide a program of education beyond secondary education;

(3) provides an educational program for which the institution awards a bachelor's degree or provides not less than a 2-year program that is acceptable for full credit toward such a degree, or awards a degree that is acceptable for admission to a graduate or professional degree program, subject to review and approval by the Secretary;

(4) is a public or other nonprofit institution; and

(5) is accredited by a nationally recognized accrediting agency or association, or if not so accredited, is an institution that has been granted preaccreditation status by such an agency or association that has been recognized by the Secretary for the granting of preaccreditation status, and the Secretary has determined that there is satisfactory assurance that the institution will meet the accreditation standards of such an agency or association within a reasonable time.

(b) Additional institutions included

For purposes of this chapter, other than subchapter IV, the term "institution of higher education" also includes—

(1) any school that provides not less than a 1-year program of training to prepare students for gainful employment in a recognized occupation

9

and that meets the provision of paragraphs (1), (2), (4), and (5) of subsection (a); and

(2) a public or nonprofit private educational institution in any State that, in lieu of the requirement in subsection (a)(1), admits as regular students individuals—

(A) who are beyond the age of compulsory school attendance in the State in which the institution is located; or

(B) who will be dually or concurrently enrolled in the institution and a secondary school.

28.     Thus, to qualify under the Agricultural Act's limited exception, a grower must be, among other things, either an institution of higher education or a State department of agriculture.  *Id.  See also* 81 Fed. Reg. 53395-96 (Aug. 12, 2016) (a copy of which is attached as Exhibit 2).

29.     Although the Agricultural Act created an exception to the CSA, "it did not remove industrial hemp from the controlled substances list." 81 Fed. Reg. 53395-96 (Aug. 12, 2016), Exhibit 2 hereto.  Thus, despite the exception, "Federal law continues to restrict hemp-related activities." *Id.*  One example of this continued restriction is 21 U.S.C. §§ 822–23, which prohibits any person or entity from manufacturing or distributing any Schedule I controlled substance (such as industrial hemp) without first obtaining a certificate of registration from the Attorney General.  Additionally, the Agricultural Act did not eliminate the Federal restrictions regarding the importation and exportation of viable cannabis seeds.  21 U.S.C. § 952.

# VI

## FACTUAL BACKGROUND

30.     In or about September 2009, IVCRC signed a 10-year agreement to lease three agricultural parcels of land from the COUNTY.  (Exhibit 3.)  All three parcels are located in the town of Brawley, Imperial County, California.  Two of those parcels, which have a combined acreage of 60 acres, are identified by Assessor Parcel Numbers ("APN") 048-240-016 and 040-130-001 (hereinafter referred to as the "County Parcels").

//

31.    In or about June 2018, IVCRC leased 35 acres of agricultural land from DAHM, for the purpose of growing "hemp."  (Exhibit 4.)  The 35-acre parcel is located at the southwest corner of Johnson Road and Forrester Road in the town of Brawley, Imperial County, California, and is identified by APN 040-090-018 (hereinafter referred to as the "Dahm Parcel").

32.    In or about June 2018, WOOD (as director of IVCRC) and BOUCHER (as CEO of FARMTIVA) executed a Memorandum of Understanding ("M.O.U.") for the purpose of growing "industrial hemp."  (Exhibit 1.)  Under the M.O.U., FARMTIVA is responsible for, among other things, providing hemp seeds to IVCRC, while IVCRC is responsible for, among other things, planting, growing, and harvesting the hemp.  (*Id.*)

33.    In or about June 2018, pursuant to their M.O.U., IVCRC began planting hemp seeds provided by FARMTIVA on the County Parcels and the Dahm Parcel.  Upon information and belief, the United States alleges that the hemp seeds provided by FARMTIVA and planted by IVCRC did not originate in California, but were instead transported across state lines and into California from another state and/or country.

34.    In or about July 2018, testing was performed on a sampling of hemp plants from both the County Parcels and the Dahm Parcel.  The testing confirms that the hemp plants from both the County Parcels and the Dahm Parcel contain THC and thus are *Cannabis sativa L.*  (*See* Exhibit 5 hereto.)  Accordingly, the hemp that Defendants have grown, and are continuing to grow, is a Schedule I controlled substance under the CSA. *See* Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, § 202, 84 Stat. 1249 (schedule I(c)(10), (17)); 21 U.S.C. § 812(c) (Schedule I(c)(10), (17)).

35.    WOOD and IVCRC recently began harvesting hemp on the County Parcels and/or the Dahm Parcel.  (*See* Declaration of Task Force Officer Matthew Argandona at ¶ 3, attached as Exhibit 6 hereto.)  The United States anticipates that WOOD and IVCRC, in concert with BOUCHER and FARMTIVA, will continue to harvest and distribute the hemp on these parcels in the coming days and weeks.  The United States also anticipates that

WOOD and IVCRC, in concert with BOUCHER and FARMTIVA, will continue to manufacture, cultivate, and harvest more hemp on the County Parcels and the Dahm Parcel – and potentially on other parcels as well – for future distribution.

36.    Defendants are not institutions of higher education, nor are they State departments of agriculture.    Additionally, because the State of California has no agricultural pilot program for hemp, Defendants are not, and have not, been growing industrial hemp under the auspices of any pilot program.

37.    Defendants have not obtained any certificate of registration from the Attorney General (pursuant to 21 U.S.C. §§ 822–23) that would allow them to grow industrial hemp. (*See* Declaration of DEA Special Agent Timothy Menino at ¶ 3, attached as Exhibit 7 hereto.)

38.    The CSA makes it unlawful, except as authorized by the CSA, for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a)(1).

39.    The CSA defines the term "manufacture" as "the production, preparation, propagation, compounding, or processing of a drug or other substance . . . ." 21 U.S.C. § 802(15).    The CSA further defines "production" as "the manufacturing, planting, cultivation, growing, or harvesting of a controlled substance." 21 U.S.C. § 802(22).

40.    The CSA also makes it unlawful, except as authorized under the CSA, to "knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1).

41.    The CSA also makes it unlawful for any person to conspire to violate the CSA. 21 U.S.C. § 846.

42.    The CSA also makes it unlawful for any person to knowingly lease, rent, use, or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance.    It also makes it unlawful for any person to manage or control any place – either as an owner, lessee, agent, employee, occupant, or mortgagee – for the

purpose of manufacturing, storing, distributing, or using a controlled substance.  21 U.S.C. § 856(a).

43.    The CSA provides that federal district courts have jurisdiction in civil actions brought by the United States to enjoin violations of the CSA. 21 U.S.C. § 882(a).

44.    By manufacturing, cultivating, harvesting, and distributing hemp, Defendants (and others who may be working in concert with them or who may be employed by them) have violated the CSA.  Defendants will continue to violate the CSA if they are not immediately enjoined from doing so.  Time is of the essence.

## VII

## CLAIMS ASSERTED BY THE UNITED STATES AGAINST THE DEFENDANTS

45.    The Defendants have engaged in the manufacturing, planting, cultivation and distribution of hemp in violation of the CSA and other federal laws.

46.    The Defendants, in concert with others, have engaged in the manufacture of hemp in violation of the CSA and other federal laws.

47.    The Defendants, in concert with others, have been engaged in the manufacture of, distribution of, and possession with intent to distribute hemp in violation of the CSA and other federal laws.

48.    The Defendants have maintained, leased, rented, and/or utilized certain land in Brawley, Imperial County, California, for the purpose of manufacturing, distributing, and possessing hemp in violation of the CSA and other federal laws.

49.    The Defendants have conspired, among themselves and with unknown individuals, to violate the CSA.

## COUNT I

50.    The United States hereby incorporates by reference paragraphs 1 through 49 as though fully set forth herein.

51.     The Defendants have violated 21 U.S.C. § 841(a)(1) in concert with others by engaging in the possession, manufacturing, distribution, and possession with the intent to distribute hemp, a Schedule I controlled substance.

52.     Defendants' actions, in concert with others, to manufacture, distribute, and possess with the intent to distribute hemp are ongoing and continuing, and, based on information and belief, are likely to continue unless enjoined by the court.

### COUNT II

53.     The United States hereby incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

54.     Under 21 U.S.C. § 856 it is unlawful to (1) knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance; and/or (2) manage or control any place, whether permanently or temporarily, either as owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for the use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

55.     The conduct of the Defendants, and others acting in concert with them, violated 21 U.S.C. § 856 as the property on which the hemp was grown was used for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

56.     Pursuant to 21 U.S.C. § 856(d), the United States is entitled to civil penalties from the Defendants of not more than the greater of $250,000 or 2 times the gross receipts, either known or estimated, that were derived from each violation that is attributable to the person.  Under 21 U.S.C. § 856(d)(2), the court may apportion the penalty between the Defendants, but the Defendants are jointly and severally liable for the civil penalty awarded pursuant to 21 U.S.C. § 856.

57.     The United States is also entitled to declaratory and injunctive relief for a violation of 21 U.S.C. § 856 pursuant to 21 U.S.C. § 856(e) and 21 U.S.C. § 843(f).

14

**COUNT III**

58.    The United States hereby incorporates by reference paragraphs 1 through 57 as though fully set forth herein.

59.    In violation of 21 U.S.C. § 864, Defendants, in concert with others, have conspired among themselves and with unknown individuals to violate the CSA.

60.    Defendants' actions, in concert with others, to conspire to violate the CSA are ongoing and continuing, and based, upon information and belief, are likely to continue unless enjoined by the court.

**COUNT IV**

61.    The United States hereby incorporates by reference paragraphs 1 through 60 as though fully set forth herein.

62.    The hemp plants, real property on which the plants have been grown, all equipment used to produce and manufacture those plants, all hemp seeds and other hemp plant components related thereto, are subject to seizure and forfeiture under 18 U.S.C. §§ 981, 985 and 21 U.S.C. § 881 and should be declared forfeited to the United States and all title and right to control those items and materials should be immediately vested in the United States.

63.    Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, should be barred and prohibited from destroying, altering, hiding, or spoiling all evidence, records, computer and digital information, and documents related to any marijuana or hemp plants, real property on which the plants have been grown, all equipment used to produce and manufacture those plants, and all hemp seeds and other hemp plant components related thereto which are the subject of this action.

//

//

//

# PRAYER FOR RELIEF

WHEREFORE, plaintiff United States of America prays that this Court enter judgment against the Defendants, and grant other and further relief, including, but not limited to, the following:

1.     Declare that Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, are in violation of 21 U.S.C. § 841(a)(1) and other federal law by engaging in the possession, manufacture, and distribution of hemp, and possession with the intent to distribute hemp, which is a Schedule I controlled substances.

2.     Declare that Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, are in violation of 21 U.S.C. § 856(a)(1) and other federal law by opening, maintaining, using, renting, leasing, managing, controlling, and/or utilizing the land and/or facilities described herein for the purpose of manufacturing, storing, possessing, distributing, or using a controlled substance.  The United States also requests that the court award all penalties and damages to which it is entitled under 21 U.S.C. § 856(d).

3.     Declare that Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, are in violation of 21 U.S.C. § 846 and other federal law by conspiring among themselves and with unknown individuals to violate the CSA.

4.     Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, from hereafter manufacturing, manufacturing with intent to distribute or distributing hemp, a Schedule I controlled substance, or possessing hemp with the intent to manufacture or distribute the substance in violation of 21 U.S.C. § 841(a)(1).

5.      Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, from hereafter opening,  maintaining, using, renting, leasing, managing, controlling, and/or utilizing land and/or facilities for the purpose of manufacturing, storing, possessing, distributing, or using marijuana or any controlled substance in violation of 21 U.S.C. § 856.

6.      Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, from hereafter conspiring to violate the CSA.

7.      Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, from harvesting, destroying, transporting, distributing, or altering in any way the hemp plants, the County Parcels, or the Dahm Parcel.

8.      Enter a temporary restraining order, preliminary injunction, and permanent injunction enjoining the Defendants, together with their employees, servants, agents, and all others acting in concert with the Defendants and those acting directly or indirectly on the Defendants' behalf, barring and prohibiting them from destroying, altering, hiding, or spoiling any and all evidence, records, computer and digital information, and documents related to the hemp plants, real property on which the plants have been grown, all equipment used to produce and manufacture those plants, and all hemp seeds and other hemp plant components related thereto which are the subject of this action.

9.      Award monetary penalties pursuant to 21 U.S.C. § 856(d) of not more than the greater of $250,000 or 2 times the gross receipts, either known or estimated, that were derived from each violation that is attributable to the person.

1      10.    Enter order of forfeiture pursuant to 18 U.S.C. §§ 981, *et seq.*, and 21 U.S.C.

2  § 881.

3      11.    All other relief as the Court may deem just and equitable.

4

5  Dated: October 19, 2018                     Respectfully submitted,

6

7                                              ADAM L. BRAVERMAN
                                               United States Attorney
8

9                                              s/ Brett Norris
                                               BRETT NORRIS
10                                             Assistant United States Attorney
                                               PAUL L. STARITA
11                                             Assistant United States Attorney
                                               Attorneys for Plaintiff
12                                             United States of America

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA

**DEFENDANTS**
PLEASE SEE ATTACHMENT

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **Imperial**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Brett Norris; AUSA Paul Starita
880 Front Street, Room 6293, San Diego, CA 92101
Tel: (619) 546-7620/7701

Attorneys *(If Known)*

**'18 CV 2408 JLS  BGS**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☒ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
21 U.S.C. Sections 801(2)(3)(4)(5)(6);802(16); 812(b); 812(b)(1); 841(a)(1); 843(f);846; 856(d); 856(e); 881; 882(a)
Brief description of cause:
Knowingly manufacturing and distributing controlled substance

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.     DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*     JUDGE _____   DOCKET NUMBER _____

DATE  10/19/2018     SIGNATURE OF ATTORNEY OF RECORD  s/ BRETT NORRIS, Assistant U.S. Attorney

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## ATTACHMENT

## DEFENDANTS

JAMES WOOD, an individual; IMPERIAL VALLEY CONSERVATION RESEARCH CENTER COMMITTEE, INC. dba IMPERIAL VALLEY CONSERVATION RESEARCH CENTER, a California Corporation; CHRISTOPHER BOUCHER, an individual; FARMTIVA INC., a California corporation; COUNTY OF IMPERIAL, a political subdivision of the State of California; STEVEN DAHM, an individual; and DOES 1 THROUGH 100

'18CV2408 JLS  BGS

# EXHIBIT 1

## MEMORANDUM OF UNDERSTANDING BETWEEN
## THE IMPERIAL VALLEY CONVERSATION CENTER AND FARMTIVA INC

Memorandum of Understanding summarizes the principal terms and conditions for the proposed Joint Venture Agricultural Project between the Imperial Valley Conversation Center (**"the Conservation Center"** or **"IVCRC"**) and Farmtiva Inc (**"Farmtiva"**). It represents a general understanding between the **Conservation Center** and Farmtiva (**'the Parties"**).   This Term Sheet is subject to demonstrated project financing by Farmtiva.

**California**
**Industrial Hemp Law:**       Division 24 Food and Agricultural Code, Industrial Hemp [81000 - 81010]: (Division 24 added by Stats. 2013, Ch. 398, Sec. 4) **81000.**

**Definition.**               A public or private institution or organization that maintains land or facilities for agricultural research, including colleges, universities, agricultural research centers, and conservation research centers; or

(a)  "Industrial hemp" has the same meaning as that term is defined in Section 11018.5 of the Health and Safety Code.

An "established agricultural research institution," as defined in Food and Agricultural Code (FAC) Section 81000, is exempt from registration and may currently grow industrial hemp in California.

**Imperial Valley Conservation**
**Research Center (IVCRC):**   On November 3, 1951 the IVCRC opened its doors as a USDA research station.  In 1999, the station was transferred out of the USDA system to the Imperial Valley Conservation Research Committee.  The committee that had existed in an advisory role took over the management role.  IVCRC's mission is to attract and foster word-class research and educational opportunities that take advantage of our unique setting with saline soils, a desert climate, and a rich agricultural community.  The center consists of 160 acres with 130 acres divided into small research plots.   In addition to the research plots, the center houses 5 green-houses, and multiple test laboratories.  Current research includes:  crop genetics, irrigation management, salinity tolerance and management, seed production and testing, agriculture chemical development, and more.

**IVCRC and Farmtiva relationship**

IVCRC will be responsible for: Management of all growing, harvesting and research activities related to seed varieties, irrigation options, fertilizer choices, etc.   Reporting research results.   Coordinating TCH testing at state accredited labs (Example: Santa Isabela).

Farmtiva will be responsible for:  providing seed varieties to be tested, consulting, project funding, and assisting in the research of the best approaches to: planting, harvesting, processing, testing, distribution, marketing, sales, etc.

**Project Vision**

Develop a complete Industrial Hemp business model for hemp farming in the Imperial Valley.  This will include: IH farming, CBD Hemp propagation, seed business, oil processing, fiber extraction, soil phytoremediation, etc.

**PROJECT OVERVIEW:**

Starting in May 2018 through April 2020, Farmtiva will lease fields, labs, cooler, and an office. Project Management services will be provided by IVCRC to grow industrial hemp.  The hemp seeds/plants are guaranteed to be below 0.3%THC

In September 2018, Thru April 2020 Farmtiva will lease an additional 65 acres from the IVCRC.

**TERM OF AGREEMENT:**

**Starting Date**

The project will begin (5/1/18) and continue until at least 4/30/20.

**Planned Acreage**

Start with 60 acres.   IVCRC will add at least 65 acres starting in Sept 2018.  Research projects will be conducted on 60 acres and managed by the Imperial Valley Conservation Research Center (IVCRC).   Additional acres will be added to the project in Sept 2018.

**Farm Services**

IVCRC will manage the project over the period mentioned above.

**Management**

IVCRC will provide GM, Admin, Project Manager, Farm Advisor, Travel, etc.

| | |
|---|---|
| Testing | Farmtiva and IVCRC will monitor and complete monthly HPLC testing protocols of cannabinoid profiles of the industrial hemp crop. |
| Field leases | Approximately 60 acres will be leased for 2 years, May 2018 through April 2020. An additional 65 acres will be leased for 20 months beginning Sept 2018 through April 2020. Additional acres may be leased as requested, if suitable acreage is available. |
| | Fields will be leased at the rate of $500 per Growing Season, as defined below. |
| | An office will be rented from May 2018 - April 2019. |
| | 2 labs and a cooler may be leased as requested, and available. |
| Growing Season | Anticipating three growing seasons a year. The first Growing Season will start in May 2018.  The growing season is approximately 100 day grow plus 20 days cut, harvest, and move to storage.  The second Growing Season will start Sept/Oct. |
| Project Research | The project will include research and development of: |

1. Water usage of hemp as a commercial agricultural crop
2. Growing season and cycle best for Imperial Valley climate.
3. To conduct experiments under the arid saline conditions of the Imperial Valley in support of U.S. agriculture in desert and arid environments.
   Note:   All research finding will be shared with the IV farming community.

**Project Pricing**

| | |
|---|---|
| Farming services | $1,000 per acre per Growing Season. |
| Facilities | Lab #1 = $600/mo, Lab #2 = $400/mo, Cooler = $200/mo, Office = $300/mo. |
| Irrigation water | Cost + 25% (Example: if 60 AF are used per year = 60 acres x $20/AF per month month x1.25 =$1.500) to be verified and based on the actual months of growing |

| | |
|---|---|
| Other Costs | Cost + 25%. Examples of services charged at cost + 25%: Fertilizer, Herbicide, drip tape, sprinklers, pump, hand weeding, etc. |
| Management fee | $14,400 /month: GM, Admin, Project Manager (100%), Farm Advisor, Travel expense. (24-months $345,600). |
| Storage facility | TBD. (Estimate = approximately $.75/SF + 25% for warehouse storage; approximately $1.50/SF + 25% for refrigerated storage). |
| Incentive payment | IVCRC will be paid (7%) of the gross revenue from total crop sales after each growing season. |
| Anticipate crop yield | Anticipated crop yield of 1,000 lbs. per acre at $25 per pound. Example: 60 acres x 1,000 lbs./acre x $25/lb. = $1.5 million. Incentive payment at 7% = $105,000. |
| Payment Terms | April 24 2018 = $200,000 deposit. Will be used to pay roughly the final 4 months of the agreement. If this project is stopped prior to the 2 year term, this deposit will not be refunded nor applied to existing invoices.<br><br>By June 1st Farmtiva will make a payment of $50,000. Invoices will be submitted at the beginning of the month reflecting monthly overhead and costs incurred the previous month. |
| Option to extend | Farmtiva has the option to extend the exclusive relationship with the IVCRC at the end of the initial 2 year period. |
| Exclusivity | During the initial project period (5/1/18 thru 4/30/20) Farmtiva will have an exclusive relationship with IVCRC for all hemp growing, seed cultivation, and other agriculture activities related to the growing of hemp and other hemp related products. This exclusivity agreement assumes Farmtiva provides all of the support and payments identified in this MOU. |
| Reporting: | IVCRC will provide a monthly financial recap reflecting actual income and invoicing for each month. On the items that have been identified as Cost + 25% (i.e. drip tape) IVCRC will provide the actual spending for those items. |

Acknowledgement

_Ji Wood_ 6-27-18

Jim Wood
Director, Imperial Valley Conversation Center

_Christoph Boucher_

Chris Boucher
CEO Farmtiva, LLC

# EXHIBIT 2

# Notices

Federal Register

Vol. 81, No. 156

Friday, August 12, 2016

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF AGRICULTURE

**Office of the Secretary**

## DEPARTMENT OF JUSTICE

**Drug Enforcement Administration**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Food and Drug Administration**

**Statement of Principles on Industrial Hemp**

**AGENCY:** Office of the Secretary, USDA; Drug Enforcement Administration, DOJ; Food and Drug Administration, HHS.

**ACTION:** Notice

**SUMMARY:** The U.S. Department of Agriculture, in consultation with the U.S. Drug Enforcement Administration and the U.S. Food and Drug Administration, has developed a *Statement of Principles on Industrial Hemp* to inform the public how Federal law applies to activities associated with industrial hemp that is grown and cultivated in accordance with Section 7606 of the Agricultural Act of 2014. The purpose of this notice is to set forth the statement in its entirety.

**DATES:** This Statement of Principles is applicable August 12, 2016.

**FOR FURTHER INFORMATION CONTACT:** Michael Poe, Telephone Number: (202) 720–3257.

**SUPPLEMENTARY INFORMATION:**

## 1. Statement of Principles

With publication of this notice, the U.S. Department of Agriculture (USDA) issues, with the concurrence of the U.S. Drug Enforcement Administration (DEA) and the U.S. Food and Drug Administration (FDA), the following Statement of Principles regarding the applicability of Federal laws to activities associated with growing and cultivating industrial hemp:

Section 7606 of the Agricultural Act of 2014 legalized the growing and cultivating of industrial hemp for research purposes in States where such growth and cultivation is legal under State law, notwithstanding existing Federal statutes that would otherwise criminalize such conduct. The statutorily sanctioned conduct, however, was limited to growth and cultivation by an institution of higher education or State department of agriculture for purposes of agricultural or other academic research or under the auspices of a State agricultural pilot program for the growth, cultivation, or marketing of industrial hemp.

Section 7606 authorized State departments of agriculture to promulgate regulations to carry out these pilot programs but did not provide a specific delegation to the U.S. Department of Agriculture (USDA) or any other agency to implement the program. As well, the statute left open many questions regarding the continuing application of Federal drug control statutes to the growth, cultivation, manufacture, and distribution of industrial hemp products, as well as the extent to which growth by private parties and sale of industrial hemp products are permissible. Section 7606 did not remove industrial hemp from the controlled substances list. Therefore, Federal law continues to restrict hemp-related activities, to the extent that those activities have not been legalized under section 7606.

USDA, having consulted with and received concurrence from the U.S. Drug Enforcement Administration (DEA) and the U.S. Food and Drug Administration (FDA), therefore, is issuing this statement of principles to inform the public regarding how Federal law applies to activities involving industrial hemp so that individuals, institutions, and States that wish to participate in industrial hemp agricultural pilot programs can do so in accordance with Federal law.

• The growth and cultivation of industrial hemp may only take place in accordance with an agricultural pilot program to study the growth, cultivation, or marketing of industrial hemp established by a State department of agriculture or State agency responsible for agriculture in a State where the production of industrial hemp is otherwise legal under State law.

• The State agricultural pilot program must provide for State registration and certification of sites used for growing or cultivating industrial hemp. Although registration and certification is not further defined, it is recommended that such registration should include the name of the authorized manufacturer, the period of licensure or other time period during which such person is authorized by the State to manufacture industrial hemp, and the location, including Global Positioning System coordinates, where such person is authorized to manufacture industrial hemp.

• Only State departments of agriculture, and persons licensed, registered, or otherwise authorized by them to conduct research under an agricultural pilot program in accordance with section 7606, and institutions of higher education (as defined in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001)), or persons employed by or under a production contract or lease with them to conduct such research, may grow or cultivate industrial hemp as part of the agricultural pilot program.

• The term "industrial hemp" includes the plant *Cannabis sativa* L. and any part or derivative of such plant, including seeds of such plant, whether growing or not, that is used exclusively for industrial purposes (fiber and seed) with a tetrahydrocannabinols concentration of not more than 0.3 percent on a dry weight basis. The term "tetrahydrocannabinols" includes all isomers, acids, salts, and salts of isomers of tetrahydrocannabinols.

• For purposes of marketing research by institutions of higher education or State departments of agriculture (including distribution of marketing materials), but not for the purpose of general commercial activity, industrial hemp products may be sold in a State with an agricultural pilot program or among States with agricultural pilot programs but may not be sold in States where such sale is prohibited. Industrial hemp plants and seeds may not be transported across State lines.

• Section 7606 specifically authorized certain entities to "grow or cultivate" industrial hemp but did not eliminate the requirement under the Controlled Substances Import and

Export Act that the importation of viable cannabis seeds must be carried out by persons registered with the DEA to do so. In addition, any USDA phytosanitary requirements that normally would apply to the importation of plant material will apply to the importation of industrial hemp seed.

• Section 7606 did not amend the Federal Food, Drug, and Cosmetic Act. For example, section 7606 did not alter the approval process for new drug applications, the requirements for the conduct of clinical or nonclinical research, the oversight of marketing claims, or any other authorities of the FDA as they are set forth in that Act.

• The Federal Government does not construe section 7606 to alter the requirements of the Controlled Substances Act (CSA) that apply to the manufacture, distribution, and dispensing of drug products containing controlled substances. Manufacturers, distributors, dispensers of drug products derived from cannabis plants, as well as those conducting research with such drug products, must continue to adhere to the CSA requirements.

• Institutions of higher education and other participants authorized to carry out agricultural pilot programs under section 7606 may be able to participate in USDA research or other programs to the extent otherwise eligible for participation in those programs.

**2. Regulatory Requirements**

This Statement of Principles does not establish any binding legal requirements. It is, therefore, exempt from notice and comment rulemaking requirements under the Administrative Procedure Act pursuant to 5 U.S.C. 553(b). Because no notice of proposed rulemaking is required, the Regulatory Flexibility Act does not require an initial or final regulatory flexibility analysis. 5 U.S.C. 603(a), 604(a). USDA has determined that this Statement of Principles does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring OMB approval under the Paperwork Reduction Act, 44 U.S.C. 3501, et seq.

Dated: July 25, 2016.

**Thomas J. Vilsack,**
*Secretary of Agriculture.*

Dated: July 21, 2016.

**Louis J. Milione,**
*Deputy Assistant Administrator, Drug Enforcement Administration.*

Dated: July 22, 2016.

**Leslie Kux,**
*Associate Commissioner for Policy, Food and Drug Administration.*

[FR Doc. 2016–19146 Filed 8–11–16; 8:45 am]

**BILLING CODE 3410–01–P**

---

**DEPARTMENT OF AGRICULTURE**

**Animal and Plant Health Inspection Service**

**[Docket No. APHIS–2016–0043]**

**Okanagan Specialty Fruits, Inc.; Availability of Preliminary Finding of No Significant Impact, Preliminary Plant Pest Risk Similarity Assessment, and Preliminary Determination for an Extension of a Determination of Nonregulated Status for Non-Browning Arctic® Apple Event NF872 Apple**

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Notice.

---

**SUMMARY:** We are advising the public that the Animal and Plant Health Inspection Service has reached a preliminary decision to extend our determination of nonregulated status of Okanagan Specialty Fruits' (OSF) GS784 and GD743 apples to OSF NF872 'Arctic® Fuji apple'. OSF's NF872 apple has been genetically engineered for enzymatic browning resistance using the same mode of action as GS784 and GD743 apples. We are making available for public comment our preliminary determination, preliminary plant pest risk similarity assessment, and preliminary finding of no significant impact for the proposed determination of nonregulated status.

**DATES:** We will consider all comments that we receive on or before September 12, 2016.

**ADDRESSES:** You may submit comments by either of the following methods:

• *Federal eRulemaking Portal:* Go to *http://www.regulations.gov/ #!docketDetail;D=APHIS-2016-0043.*

• *Postal Mail/Commercial Delivery:* Send your comment to Docket No. APHIS–2016–0043, Regulatory Analysis and Development, PPD, APHIS, Station 3A–03.8, 4700 River Road Unit 118, Riverdale, MD 20737–1238.

The Okanagan Specialty Fruits extension request, our preliminary determination, preliminary plant pest risk similarity assessment, preliminary finding of no significant impact, and any comments we receive on this docket may be viewed at *http:// www.regulations.gov/ #!docketDetail;D=APHIS-2016-0043* or in our reading room, which is located in

room 1141 of the USDA South Building, 14th Street and Independence Avenue SW., Washington, DC. Normal reading room hours are 8 a.m. to 4:30 p.m., Monday through Friday, except holidays. To be sure someone is there to help you, please call (202) 799–7039 before coming.

Supporting documents and any comments we received regarding our determination of nonregulated status of the antecedent organisms (apple events GD743 and GS784), can be found at *http://www.regulations.gov/ #!docketDetail;D=APHIS-2012-0025.* Supporting documents may also be found on the APHIS Web site for NF872 'Arctic® Fuji apple' (the organism under evaluation) under APHIS Petition Number 16–004–01p, and the antecedent organisms (apple events GD743 and GS784) under APHIS Petition Number 10–161–01p.

**FOR FURTHER INFORMATION CONTACT:** Dr. John Turner, Director, Biotechnology Risk Analysis Programs, Biotechnology Regulatory Services, APHIS, 4700 River Road Unit 147, Riverdale, MD 20737– 1236; (301) 851–3954, email: *john.t.turner@aphis.usda.gov.* To obtain copies of the supporting documents, contact Ms. Cindy Eck at (301) 851– 3885, email: *cynthia.a.eck@ aphis.usda.gov.*

**SUPPLEMENTARY INFORMATION:** Under the authority of the plant pest provisions of the Plant Protection Act (PPA) (7 U.S.C. 7701 et seq.), the regulations in 7 CFR part 340, "Introduction of Organisms and Products Altered or Produced Through Genetic Engineering Which Are Plant Pests or Which There Is Reason to Believe Are Plant Pests," regulate, among other things, the introduction (importation, interstate movement, or release into the environment) of organisms and products altered or produced through genetic engineering that are plant pests or that there is reason to believe are plant pests. Such genetically engineered organisms and products are considered "regulated articles."

The regulations in § 340.6(a) provide that any person may submit a petition to the Animal and Plant Health Inspection Service (APHIS) seeking a determination that an article should not be regulated under 7 CFR part 340. Further, the regulations in § 340.6(e)(2) provide that a person may request that APHIS extend a determination of nonregulated status to other organisms. Such a request must include information to establish the similarity of the antecedent organism and the regulated article in question.

# EXHIBIT 3

BOS Approved 09-01-09
M.O. #41

Recorded in Official Records.
Imperial County
Doc#:   2009-029630
10/14/2009   3:30 PM

### LEASE AMENDMENT #1

### (Imperial Valley Conservation Research Center Committee, Inc.)

THIS LEASE MODIFICATION AGREEMENT, dated this 1st day of September, 2009 is by and between the COUNTY OF IMPERIAL, a political subdivision of the State of California ("COUNTY") and IMPERIAL VALLEY CONSERVATION RESEARCH CENTER COMMITTEE, INC., a California nonprofit organization ("Lessee").

### WITNESSETH:

WHEREAS, COUNTY and LESSEE entered into that certain Lease Agreement February 17, 1998 ("the Original Lease Agreement"), attached hereto as Exhibit "A";

WHEREAS, LESSEE desires to modify the agreement to extend the agreement for a period of ten (10) years and COUNTY wishes to permit LESSEE to extend the lease such period;

WHEREAS, the parties to the Original Lease Agreement desire to modify the terms of the Agreement;

NOW THEREFORE, for and in consideration of the promises and payments herein set forth, COUNTY and LESSEE have and hereby agree as follows:

1.     1.   The following term shall be added to the second recital (after WHEREAS on page 1, line 11) and shall be added to the Original Lease Agreement as Paragraph 24:

### 24.   PREMISES

The premises of this lease consist of the following described parcels of real property located at the County of Imperial, State of California (the Premises), also known as the Brawley Irrigated Desert Research Station, sometimes referred to herein as the "Brawley Field Station:"

**Parcel 1**: Assessor's Parcel Number 040-130-002: That portion of Tract 109, Township 14 South, Range 14 East, S.B.B.M., all according to the United States Government Official Plat of Resurvey approved and on file in the United States Land Office at Los Angeles, California lying North of Highway 99. A copy of Assessor's Plat Page for this parcel is attached hereto as Exhibit B and incorporated herein by this reference.

**Parcel 2**: Assessor's Parcel Number 048-240-016: Lots 5 and 6 of U.S. DeMoulin's Subdivision No. 4 according to Map 262 on file in the office 0f the County Recorder of

Imperial County, California, excepting, however, a strip 20 feet wide off of the West end of said Lot 5. A copy of Assessor's Plat Page for this parcel is attached hereto as Exhibit C and incorporated herein by this reference.

**Parcel 3**: Assessor's Parcel Number 040-130-001: The East 80 acres of that portion of Tract 109, Township 14 South, Range 14 East, S.B.B.M., lying North of the North line of Highway 99 situated in the County of Imperial, State of California, according to the United States Government Plat of Resurvey approved and filed in the United States Land Office at Los Angeles, California. A copy of Assessor's Plat Page for this parcel is attached hereto as Exhibit B and incorporated herein by this reference.

2.      Paragraph 1 of the Original Lease Agreement is revised as follows:

"This Lease shall be extended for a period of ten (10) years. The term of this lease shall be for a period beginning January 1, 2009 and ending December 31, 2018, unless extended or sooner terminated in accordance with the provisions of this lease. Lessee may, at Lessee's option, extend the term of this lease for an additional ten (10) year period, subject to a review of the preceding ten (10) year period by COUNTY. The review shall be to confirm that Lessee is in full compliance with the terms of this lease and the purposes for which the lands subject hereto was dedicated.

Lessee shall notify COUNTY of Lessee's intention to extend the term of the lease in writing at least sixty (60) days prior to the end of the term.

In like manner, LESSEE may extend the term of the lease for two (2) additional ten (10) year Terms (this Agreement provides a total of three lease extensions)."

3.      Paragraph 16 of the Original Lease Agreement is revised as follows:

Any written notice given under this lease, if not personally delivered to either party hereto, shall be sent by certified mail with postage prepaid and return receipt requested, directed to the following:

County Executive Office

County of Imperial

940 W. 8th Street, Suite 208

El Centro, CA 92243

*and*

Agricultural Commissioner

County of Imperial

852 Broadway

El Centro, CA 92243

*and*

IMPERIAL VALLEY CONSERVATION RESEARCH CENTER COMMITTEE. INC.

attn: Richard Kershaw

4151 Highway 86

Brawley, CA 92227

Phone: 760-344-4148

Fax: 760-352-6013

The service of any such notice shall be deemed complete at the time of such personal delivery or within five (5) days after the deposit thereof, so addressed and registered, in the United States Mail the State of California. Should Lessee constitute more than one person, personal delivery or the mailing of such notice to any one of such persons shall constitute complete service thereof upon all such persons.

4.    Paragraph 10 of the Original Lease Agreement is revised as follows:

**10.    INDEMNIFICATION**

10.1. LESSEE agrees to the fullest extent permitted by law to indemnify, defend, protect and hold COUNTY and its representatives, officers, directors, designees, employees, agents, successors and assigns harmless from any and all claims, expenses, liabilities, causes of action, demands, losses, penalties, attorneys fees and costs, in law or equity, of every kind and nature whatsoever arising out of or in connection with LESSEE's negligent acts and omissions or willful misconduct under this Lease ("Claims"), whether or not arising from the passive negligence of COUNTY, but does not include Claims that are finally determined to be the result of the sole negligence or willful misconduct of COUNTY.

10.2. LESSEE agrees to defend with counsel acceptable to COUNTY, indemnify and hold COUNTY

harmless from all Claims, including but not limited to:

10.2.1. Personal injury, including but not limited to bodily injury, emotional injury, sickness or disease or death to persons including but not limited to COUNTY's representatives, officers, directors, designees, employees, agents, successors and assigns, subcontractors and other third parties and/or damage to property of anyone (including loss of use thereof) arising out of LESSEE's negligent performance of, or willful misconduct surrounding, any of the terms contained in this Lease, or anyone directly or indirectly employed by LESSEE or anyone for whose acts LESSEE may be liable;

10.2.2. Liability arising from injuries to LESSEE and/or any of LESSEE's employees or agents arising out of LESSEE's negligent performance of, or willful misconduct surrounding, any of the terms contained in this Lease, or anyone directly or indirectly employed by LESSEE or anyone for whose acts LESSEE may be liable;

10.2.3. Penalties imposed upon account of the violation of any law, order, citation, rule, regulation, standard, ordinance or statute caused by the negligent action or inaction, or willful misconduct of LESSEE or anyone directly or indirectly employed by LESSEE or anyone for whose acts LESSEE may be liable;

10.2.4. Infringement of any patent rights which may be brought against COUNTY arising out of LESSEE's work;

10.2.5. Any violation or infraction by LESSEE of any law, order, citation, rule, regulation, standard, ordinance or statute in any way relating to the occupational health or safety of employees; and

10.2.6. Any breach by LESSEE of the terms, requirements or covenants of this Lease.

10.3.    The indemnification provisions of Paragraphs 10.2.1 through 10.2.6 above shall extend to Claims occurring after this Lease is terminated, as well as while it is in force.

5.    Paragraph 11 of the Original Lease Agreement is revised as follows:

## 11.    INSURANCE

11.1.    LESSEE hereby agrees at its own cost and expense to procure and maintain during the entire term of this Lease, and any extended term thereof, commercial general liability insurance (bodily

injury and property damage), employer's liability insurance, commercial automobile liability insurance (bodily injury and property damage), property coverage and fire and extended in a sum acceptable to COUNTY and adequate to cover potential liabilities arising in connection with the performance of this Lease and in any event not less than the minimum limit set forth as follows:

| Insurance | Minimum Limit |
|---|---|
| Worker's Compensation, Coverage A | Statutory |
| Employers Liability, Coverage B | $1,000,000 |
| Commercial General Liability | |
| (Including Contractual Liability): | |
|    Bodily Injury | $2,000,000/occurrence |
| | $5,000,000 aggregate |
|    Property Damage | $2,000,000/occurrence |
| | $5,000,000 aggregate |
| Commercial Automobile Liability | |
|    (owned, hired & non-owned vehicles) | |
|    Bodily Injury | $1,000,000 |
|    Property Damage | $1,000,000 |
| Pollution Liability | $1,000,000/occurance |
| | $2,000,000 aggregate |

Property Coverage

   In an amount not less than the full replacement cost and/or all improvements constructed thereon, in the event of loss, damage or destruction by fire, earthquake and other perils commonly covered by standard extended coverage endorsements.

Fire and Extended Coverage

   In an amount not less than the certified cost of the building(s) and improvements maintained on the Premises and including the full replacement for all improvements in the event of loss, damage or destruction by fire and other perils commonly covered by standard extended coverage endorsements.

11.2.  <u>Special Insurance Requirements</u>.  All insurance required under paragraph 22 shall:

11.2.1. Be procured from an insurer authorized to do business in California.

11.2.2. Be primary coverage as respects COUNTY and any insurance or self-insurance maintained by COUNTY shall be in excess of LESSEE's insurance coverage and shall not contribute to it.

11.2.3. Name COUNTY as an additional insured on all policies, except Workers' Compensation, and provide that COUNTY may recover for any loss suffered by COUNTY by reason of LESSEE's negligence.

11.2.4. State that it is primary insurance and regards COUNTY as an additional insured and contains a cross-liability or severability of interest clause.

11.2.5. Not be canceled, non-renewed or reduced in scope of coverage until after thirty (30) days written notice has been given to COUNTY.  However, LESSEE may not terminate such coverage until it provides COUNTY with proof that equal or better insurance has been secured and is in place.  Cancellation or change without the prior written consent of COUNTY shall, at the option of COUNTY, be grounds for termination of this Lease.

11.3.  <u>Additional Insurance Requirements</u>.

11.3.1. Complete copies of certificates of insurance for all required coverages including additional insured endorsements and 30-day notice of cancellation clause endorsements shall be attached hereto as Exhibit [#] and incorporated herein.

11.3.2. COUNTY is to be notified immediately of all insurance claims.  COUNTY is also to be notified if any aggregate insurance limit is exceeded.

11.3.3. The comprehensive or commercial general liability shall contain a provision of endorsements stating that such insurance:

A.    Includes contractual liability;

B.    Does not contain any exclusions as to loss or damage to property caused by explosion or resulting from collapse of buildings or structures or damage to property underground, commonly referred to by insurers as the "XCU Hazards;"

C.    Does not contain a "pro rata" provision which looks to limit the insurer's liability to the total proportion that its policy limits bear to the total coverage available to the insured; and

D.    Does not contain an "excess only" clause which requires the exhaustion of other insurance prior to providing coverage.

11.3.4. LESSEE shall require and verify that all subcontractors maintain insurance meeting all the requirements stated herein.

11.4.   Deposit of Insurance Policy.  Promptly on issuance, reissuance, or renewal of any insurance policy required by this Lease, LESSEE shall, if requested by COUNTY, cause to be given to COUNTY satisfactory evidence that insurance policy premiums have been paid together with a duplicate copy of the policy or a certificate evidencing the policy and executed by the insurance company issuing the policy or its authorized agent.

11.5   Additional Insurance.  Nothing in this, or any other provision of this Lease, shall be construed to preclude LESSEE from obtaining and maintaining any additional insurance policies in addition to those required pursuant to this Lease.

6.    The following term shall be added to the Original Lease Agreement as Paragraph 23:

**23.   ASSUMPTION OF RISK**

LESSEE assumes all risk of fire and other hazards such as theft, vandalism, and other malicious or criminal activities to the subject aircraft and all personal property which may be stored in/on the Premises and agrees to indemnify, defend and hold harmless COUNTY, its officers, agents, officials and employees from any damages resulting therefrom. Any security provided to the Premises will be at the sole cost and expense of LESSEE.

7.    The following term shall be added to the Original Lease Agreement as Paragraph 24:

**24.   RECORDATION**

This Lease upon execution shall be recorded with the Imperial County Recorder.

8.    All other terms and conditions are and will remain in full force and effect. There are no other modifications, express or implied except provided herein.

//

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day and year first above written.

                                            COUNTY OF IMPERIAL:

                              By _____
                                  Wally Leimgruber, Chairman
                                  Board of Supervisors

ATTEST:

_____
SYLVIA BERMUDEZ, Clerk of the Board of Supervisors
County of Imperial, State of California

                                            LESSEE:

                              By: _____
                                  JOHN R. KERSHAW, President

                              By _____
                                  DON BROCK, Vice President

APPROVED AS TO FORM:

MICHAEL L. ROOD
County Counsel

By: _____
    KATHERINE KMIEC TURNER
    Deputy County Counsel

Exhibit "A"

# AGRICULTURAL LEASE

This Agricultural Lease, made this ___17th___ day of February, 1998, by and between THE COUNTY OF IMPERIAL, a political subdivision of the State of California ("Lessor"), and IMPERIAL VALLEY CONSERVATION RESEARCH CENTER COMMITTEE, INC., a California nonprofit organization ("Lessee").

## RECITALS

WHEREAS, Lessee is a duly incorporated nonprofit corporation organized only for the purpose of conducting agricultural research and carrying on educational activities related to general farming practices, with no part of its earnings benefiting any member, trustee, officer or individual without the prior approval of Lessee; and

WHEREAS, the premises of this lease consist of the following described parcels of real property located in the County of Imperial, State of California (the "Premises"), also known as the Brawley Irrigated Desert Research Station, sometimes referred to herein as the "Brawley Field Station:"

> Parcel 1:    That portion of Tract 109, Township 14 South, Range 14 East, S.B.B.M., all according to the United States Government Official Plat of Resurvey approved and on file in the United States Land Office at Los Angeles, California lying North of Highway 99;

> Parcel 2:    Lots 5 and 6 of U.S. DeMoulin's Subdivision No. 4 according to Map 262 on file in the office of the County Recorder of Imperial County, California, excepting, however, a strip 20 feet wide off of the West end of said Lot 5;

> Parcel 3:    The East 80 acres of that portion of Tract 109, Township 14 South, Range 14 East, S.B.B.M., lying North of the North line of Highway 99, situated in the County of Imperial, State of California, according to the United States Government Plat of Resurvey approved and filed in the United States Land Office at Los Angeles, California; and

WHEREAS, the Premises described herein were originally acquired at various times during the late 1940's and early 1950's, by persons interested in having agricultural research conducted in Imperial County; then as to parcels 1 and 2 described above, conveyed by the nonprofit organization to the County of Imperial to be used solely for the purposes of

1   conducting such agricultural research, and as to parcel 3 described above, conveyed by the

2   nonprofit organization to the United States of America, also solely for the purposes of

3   conducting such agricultural research; and

4       WHEREAS, from the time of such conveyances referenced above, Lessee has on a

5   continuing basis occupied the Premises and conducted agricultural research under the authority

6   and direction of the United States Department of Agriculture (the United States Department of

7   Agriculture has held leases on parcels 1 and 2); and

8       WHEREAS, the United States Department of Agriculture will no longer be operating

9   the Premises and has now determined to convey parcel 3 to the County of Imperial in response

10  to the County of Imperial's request that the use of the Brawley Field Station for agricultural

11  research be continued under the direction of the Lessee.

12      NOW THEREFORE, in consideration of the above-mentioned recitals, the covenants

13  and conditions contained herebelow, Lessee and Lessor agree as follows:

14      1.      TERM

15      The term of this lease shall be for a period beginning January 1, 1998, and ending

16  December 31, 2008, unless sooner terminated in accordance with the provisions of this lease.

17  Lessee may, at Lessee's option, extend the term of this lease for an additional ten year period,

18  subject to a review of the preceding ten year period by Lessor. The review shall be to confirm

19  that Lessee is in full compliance with the terms of this lease and the purposes for which the

20  lands subject hereto was dedicated.

21      Lessee shall notify Lessor of Lessee's intention to extend the term of the lease in writing

22  not more than one year or less than six months prior to the end of the term. Upon receipt of

23  such notice, Lessor shall schedule a public hearing before the Board of Supervisors to perform

24  the review above mentioned. Such public hearing shall be held not less than three months prior

25  to the end of the lease term.

26      In like manner, Lessee may extend the term of the lease for three additional ten year

27  terms.

28

2.   **USE OF PREMISES**

The leased Premises shall be used generally for activities which are directly, or indirectly associated with agriculture.

3.   **RENT**

Lessee shall pay rent in the sum of One Dollar ($1.00) annually. Rent shall be paid in advance on or before the 1st of January of each year.

4.   **MAINTENANCE; REPAIRS; AND ALTERATIONS**

During the term of this lease, Lessee shall, at Lessee's sole cost and expense, maintain the Premises and all improvements in good condition and repair, ordinary wear and tear and destruction or damage by natural disaster excepted. Items that shall be maintained at Lessee's sole expense include, but are not limited to, all buildings, all roadways, irrigation systems, tile drains and outlets on said Premises. Lessee shall further keep in good repair for the unrestricted flow of water, all ditch lines located upon the leased Premises and used for the irrigation thereof, destruction or damage by natural disaster excepted. Lessee shall further keep the cultivated and non-cultivated areas of the Premises reasonably free of noxious weeds and other voluntary growth which may harbor pests that could harm or damage crops or create an agricultural nuisance. The foregoing notwithstanding, Lessee shall have the right to remove, alter, or construct tile lines, irrigation and drainage ditches and systems presently existing, or hereafter constructed, on the Premises in such manner as Lessee reasonably determines is appropriate for the agricultural research conducted upon the Premises.

5.   **WASTE; NUISANCE**

Lessee shall not commit, or permit others to commit, waste, or cause a nuisance, on the Premises. Lessee shall not introduce onto the Premises any quarantined plant or any pest, or plant which may host or harbor a pest, that may be harmful or deleterious to other agricultural or ornamental plants without the prior written consent of the Imperial County Agricultural Commissioner.

Lessee shall dispose of all wastes off the Premises. Lessee shall not dispose of, or allow the disposal of, wastes on the Premises.

**6.   UTILITIES**

Lessee shall pay all charges for utilities and for irrigation water supplied to the Premises including any water availability charges assessed by the Imperial Irrigation District, Bureau of Reclamation, or any other federal or state agency.

**7.   LIENS**

Lessee shall not suffer or permit any mechanics' liens or other encumbrances to be placed upon the leased Premises and Lessee agrees to hold Lessor and the leased Premises free and harmless from any and all such liens and encumbrances.

**8.   REMOVAL OF FIXTURES**

At the normal expiration of the term, provided Lessee is not then in default, Lessee shall have the right to remove any and all fixtures purchased by Lessee and placed on the Premises, including, but not limited to, pumps, motors, pipes, irrigation system gates, and other components of any irrigation delivery and drainage systems, and provided Lessee complies with Lessor's reasonable requirements respecting the resultant appearance of the Premises.

**9.   RESERVATIONS**

(a)  Lessor reserves the right, by its agents and employees, to enter upon the leased Premises, or any part thereof, at any reasonable time or times during the term of this lease, for the purpose of inspecting the same and all work and operations conducted thereupon by Lessee, and of otherwise protecting Lessor's interest in and to said Premises and Lessor shall have the right to maintain such notices on the leased Premises as may be necessary to protect Lessor against loss or liability from mechanics' liens or otherwise.

(b)  In the event Lessee shall fail to properly care for the leased Premises and the improvements thereon, as hereinabove provided, then Lessor, after first giving Lessee fifteen (15) days written notice of its failure, may, at its option by its agents and employees, enter upon the leased Premises, or any part thereof, and without hindrance from or liability to Lessee,

perform such work thereon as Lessor may deem necessary for the proper repair or care thereof, and in such event Lessee agrees to pay to Lessor, upon demand, all costs and expenses incurred in such work, and any default in such payment shall constitute a breach of the covenants and conditions of this lease.

### 10.   NON-LIABILITY

Lessor shall not be liable for any loss, damage or injury of any kind or character to any person or property caused by or arising from any use of the leased Premises by Lessee or any of his operations thereon; and Lessee, as a material part of the consideration of this lease, hereby waives all claims and demands against Lessor for, and hereby agrees to indemnify and hold Lessor entirely free and harmless from all liability for any such loss, damage or injury, together with all cost and expenses occasioned thereby and arising therefrom.

### 11.   INSURANCE

During the term of this lease Lessee shall obtain and maintain the following insurance coverage at Lessee's sole cost and expense:

(a)   Public Liability and Property Damage Insurance.   Lessee shall obtain and maintain a policy or policies of comprehensive public liability and property damage insurance with the combined single liability limit of not less than one million dollars ($1,000,000), insuring against all liability of Lessee and Lessee's employees and authorized representatives arising out of and/or in connection with the Lessee's use and occupancies of the Premises.  Both parties shall be named as additional insureds, and the policy shall contain cross-liability endorsements.

(b)   Fire and Extended Coverage.   Throughout the term, at Lessee's sole cost and expense, Lessee shall keep or cause to be kept insured all buildings located on the Premises against loss or damage by fire and such other risks as are now or hereafter included in an extended coverage endorsement in common use for structures of the kind maintained on the Premises, including vandalism and malicious mischief.  The amount of the insurance shall be sufficient to prevent either Lessor or Lessee from becoming a co-insurer under the provisions of

the policies, but in no event shall the amount be less than eighty percent (80%) of the actual replacement cost, including costs of replacing excavations and foundations, but without deduction for depreciation (herein called the full insurable value). If any dispute whether the amount of insurance complies with the above cannot be resolved by agreement, Lessor may, not more often than once every twelve (12) months, request the carrier of the insurance then in force to determine the full insurable value as defined in this provision, and the resulting determination shall be conclusive between the parties for the purpose of this paragraph.

Lessor, at Lessee's cost and expense, shall cooperate fully with Lessee to obtain the largest possible recovery, and all policies of fire and extended coverage insurance required by this paragraph 11(b) shall provide that the proceeds shall be paid to Lessee. Any insurance proceeds remaining after complying with the provisions of this lease relating to maintenance, repair and reconstruction of improvements shall be the Lessee's sole property.

(c)     Insurance Policies.    All insurance policies required by this lease shall be obtained from companies which are acceptable to the Lessor. Within ten (10) days from the commencement of the term, Lessee shall deliver to Lessor copies of all policies of insurance or certificates evidencing the existence in amounts of insurance with loss payable clause satisfactory to the Lessor. No insurance policy will be canceled or subject to reduction of coverage or other modification except after ten (10) days prior written notice by Lessee.

(d)     Lessor's Right to Obtain Insurance.    If at any time Lessee does not carry the insurance required by this lease, Lessor has the right to acquire said insurance and have it billed to Lessee.

## 12.    TERMINATION

In the event the Lessee shall use or attempt to use the leased Premises for any purpose other than that hereinabove authorized or to keep and maintain said Premises in repair as hereinabove required or to pay or make settlement of the rental hereunder and any such default or breach shall continue for the period of fifteen (15) days after written notice thereof by Lessor to Lessee in the manner hereinafter provided, then in any such event, Lessor, at its option may

terminate this lease and upon such termination, this lease shall cease and end, and Lessee shall thereafter have no further rights or interests hereunder or in or to the leased Premises or any part thereof, and Lessor may enter into possession of the leased Premises and all improvements thereon, and all crops then growing and maturing thereon, and remove Lessee and all persons claiming under Lessee therefrom.

### 13.   REMOVAL

Upon expiration of the term hereof, or any sooner termination of this lease, Lessee shall quit and surrender possession of the leased Premises and all structures and other improvements thereon to Lessor, in as good condition as upon delivery of possession to Lessee hereunder, ordinary use thereof and damage by the elements or causes over which Lessee shall have no control excepted, and all crops then growing thereon, if any, and upon vacating said Premises Lessee shall remove therefrom all equipment and other personal property placed thereon by Lessee, and Lessee, if requested by Lessor, shall execute, acknowledge and deliver to Lessor a proper instrument releasing and quitclaiming to Lessor all of the right, title and interest of Lessee in and to the leased Premises by reason of this lease, or otherwise.

### 14.   LESSEE'S RIGHT TO POSSESSION NOT TERMINATED

Notwithstanding any other remedies Lessor may have upon Lessee's breach, Lessor, at its option, may continue this lease in full force and effect, and the lease will continue in effect as long as Lessor does not terminate Lessee's right to possession, and Lessor shall have the right to collect rent when due.  During the period Lessee is in default, Lessor can enter the Premises and relet them, or any part of them, to third parties for Lessee's account.  Lessee shall be liable immediately to Lessor for all costs Lessor incurs in reletting the Premises, including, without limitation, brokers' commissions, advertising and like costs.  Reletting can be for a period shorter or longer than the remaining term of this lease.  Lessee shall pay to Lessor the rent due under this lease on the dates the rent is due, less the rent Lessor receives from any reletting.  No act by Lessor allowed by this paragraph shall terminate this lease unless Lessor notifies Lessee that Lessor elects to terminate the lease.  After Lessee's default and for as long as Lessor does

not terminate Lessee's right to possession of the Premises, if Lessee obtains Lessor's consent Lessee shall have the right to assign or sublet its interest in this lease, but Lessee shall not be released from liability.  Lessor's consent to a proposed assignment or subletting shall not be unreasonably withheld.

### 15.   HOLDING OVER

Except as hereinafter provided, this lease shall not be renewed or extended, except in writing executed by Lessor; and any holding over by Lessee after the expiration of the term hereof, except by and with the written approval of Lessor, shall not operate as a renewal or extension of this lease and shall not confer on the Lessee any right in and to the leased Premises whatsoever.

### 16.   NOTICES

Any written notice given under this lease, if not personally delivered to either party hereto, shall be sent by registered mail with postage prepaid, directed to Lessor at Agricultural Commissioner, 150 S. 9th Street, El Centro, CA 92243, and to Lessee at IMPERIAL VALLEY CONSERVATION RESEARCH CENTER COMMITTEE, INC, 338 Andrita Place, Brawley, CA 92227, attn: Richard Kershaw. (760.344.4148 / fax 760.352.6013)  The service of any such notice shall be deemed complete at the time of such personal delivery or within five (5) days after the deposit thereof, so addressed and registered, in the United States Mail in the State of California.  Should Lessee constitute more than one person, personal delivery or the mailing of such notice to any one of such persons shall constitute complete service thereof upon all such persons.

### 17.   WATER

Water shall be used only on the Premises and in pursuit and performance of Lessee's operations and obligations under this Lease.  No water shall be used upon or be exported to other lands.  Lessor assumes no responsibility to Lessee for any water shortage from the source or sources of water under Lessor's water rights, or from any source whatsoever; nor does Lessor warrant the quality or quantity of water obtained from any source or sources.

Lessor shall not have the right to transfer, convey, or sell water which is required by Lessee for the production of crops during the term of this Lease, unless such taking, transfer or sale occurs as a result of an involuntary taking or under the threat of an involuntary taking. If in the event there is an involuntary taking or a transfer made by the Lessor under the threat of an involuntary taking, then Lessee shall have the option to terminate the Lease, or any extension thereof.

**18    USE OF HAZARDOUS MATERIAL CLAUSE**

Lessee agrees to use no substance or material in connection with its operations and activities on the leased Premises which are classified under any statute, rule, regulation, or order of any governmental authority as hazardous or toxic, unless such use is expressly authorized as an agricultural use, as that term is defined in Section 11408 of the Food and Agricultural Code. Lessee shall not store any hazardous or toxic material on the leased Premises, except to the extent such storage is temporary, and is incidental to its application on the leased Premises for agricultural purposes.

**19.    NON-ASSIGNMENT CLAUSE**

Lessee shall not assign any part of the Premises without first obtaining the written consent of Lessor. The provisions of this paragraph shall not prohibit Lessee from entering into subleases or licenses for the operation of any portion of the Premises. Each sublease or license that is entered into by Lessee shall be subject to the provisions of this lease.

**20.    INVOLUNTARY ASSIGNMENT**

No interest of Lessee in this lease shall be assignable by operation of law. Each of the following acts shall be considered an involuntary assignment:

(a)    If tenant is or becomes bankrupt or insolvent, makes an assignment for the benefit of creditors, or institutes a proceeding under the Bankruptcy Act in which Lessee is the bankrupt;

(b)    If a writ of attachment or execution is levied on this lease;

(c)     If, in any proceeding or action to which Lessee is a party, a receiver is appointed with authority to take possession of the Premises; or

(d)     If Lessee shall fail to maintain its qualification under the California Corporations Code as a nonprofit corporation.

An involuntary assignment shall constitute a default by Lessee and Lessor shall have the right to elect to terminate this lease, in which case this lease shall not be treated as an asset of Lessee. If a writ of attachment or execution is levied on this lease, Lessee shall have fifteen (15) days in which to cause the attachment or execution to be removed. If any involuntary proceeding in bankruptcy is brought against Lessee, or if a receiver is appointed, Lessee shall have sixty (60) days in which to have the involuntary proceeding dismissed or the receiver removed. If Lessee has lost its qualification as a nonprofit corporation, Lessee shall have ninety (90) days in which to have its nonprofit qualification restored.

### 21.    ATTORNEY'S FEES ON DEFAULT

In any action or proceeding by either party to enforce this lease or any provision thereof, the prevailing party shall be entitled to all costs incurred and to reasonable attorney's fees.

### 22.    ANNUAL REPORTING REQUIREMENTS

Lessee shall provide an annual written report to the Imperial County Agricultural Commissioner no later than sixty days following the close of Lessee's fiscal year. The report shall detail the financial status of the Lessee, including a Balance Sheet and Income and Expense Statement, and summarize the activities conducted or allowed by Lessee on the Premises.

/////
/////
/////
/////
/////

1    IN WITNESS WHEREOF, each of the parties hereto has executed the lease the day

2  and year first above designated.

3

4  LESSEE:

5  IMPERIAL VALLEY CONSERVATION
   RESEARCH CENTER COMMITTEE,

6         INC.

7

8  By _____
      John R. Kershaw, President

9

10 By _____
      John Veysey, Vice President

11

12                                              COUNTY OF IMPERIAL:

13

14                                              WAYNE J. VAN DE GRAAFF, Chairman
                                                Board of Supervisors

15

16         ATTEST:

17

18 BY: _____
      LINDA K. WEAVER, Clerk of
      the Board of the County of

19    Imperial, State of California

20

21

22         APPROVED AS TO FORM:

23         THOMAS M. FRIES

24

25 BY: _____
      George T. Poppic, Jr.

26    Deputy County Counsel

27

28
   GTP.AG&WM.AGSTAT2a.DOC            PAGE 11            GTP:02-03-98

Exhibit "B"



TRACTS 108, 109, 117 & 118 & POR SEC 4 TO 9 Incl T14S R14E

Tax Area Code
1-014
1-024
56-000

40-13

Assessor's Map Bk.40-Pg.13
County of Imperial, Calif.

DISCLAIMER:
THIS IS NOT AN OFFICIAL MAP.
THIS MAP WAS CREATED FOR THE IMPERIAL COUNTY
ASSESSOR, FOR THE SOLE PURPOSE OF AIDING IN
THE PERFORMANCE OF THE DUTIES OF THE ASSESSOR.
ANY ERRORS OR OMISSIONS IN THIS MAP ARE NOT
THE RESPONSIBILITY OF THE COUNTY OF IMPERIAL
OR THE ASSESSOR. (REV. & TAX. CODE SEC.327)

REMAP
11-18-97 RM
3-29-78 LS
12-16-91 RM      06-01-07 MF
7-10-97 LS       01-14-05 RM

Exhibit "C"



U. S. DE MOULIN TRACT 3 & 4, SEC. 5, 6,  T. 14S., R. 14E.
O.M 4-19

Tax Area Code
1-012
56-000

48-24

Assessor's Map Bk.48-Pg.24
County of Imperial, Calif.

DISCLAIMER:
THIS IS NOT AN OFFICIAL MAP.
THIS MAP WAS CREATED FOR THE IMPERIAL COUNTY
ASSESSOR, FOR THE SOLE PURPOSE OF AIDING IN
THE PERFORMANCE OF THE DUTIES OF THE ASSESSOR.
ANY ERRORS OR OMISSIONS IN THIS MAP ARE NOT
THE RESPONSIBILITY OF THE COUNTY OF IMPERIAL
OR THE ASSESSOR. (REV. & TAX. CODE SEC.327)

4-23-07 MF
10-3-94 RM
3-12-93 RM
9-17-92 DP     5-23-08 MF
11-6-92 LS     9-19-07 MF
01-14-05 RM    8-17-07 MF
03-09-05 AR    7-11-07 MF    11-18-08 MF
12-28-05 RM    7-02-07 MF    10-29-08 MF

Bk.40
Pg.13

*ALL PURPOSE ACKNOWLEDGEMENT*

*STATE OF CALIFORNIA*
*BOARD OF SUPERVISORS*        **} SS**
*COUNTY OF IMPERIAL*

On **September 1, 2009** before me, **Sylvia Bermudez, Clerk of the Board of Supervisors** personally appeared **Wally Leimgruber** who proved to me on the basis of satisfactory evidence to be the **person**(s) whose **name**(s) **is**/are subscribed to the within instrument and acknowledged to me that **he**/she/they executed the same in **his**/her/their authorized **capacity**(ies) and that by **his**/her/their signature(s) on the instrument the **person**(s) or the entity upon behalf of which the **person**(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing is true and correct.

*WITNESS my hand and official seal:*



_____
*Sylvia Bermudez, Clerk of the Board*
*County of Imperial, State of California*

EXHIBIT 4

# FARM LEASE

**FIELD: SUMAC 83 NE**                    **ACRES: 35**

This lease and agreement is made as of May 29, 2018, by and between Steven G. Dahm, P.O. Box 721, Brawley, CA 92227-0721, hereinafter referred to as the LESSOR, and, IVCRC hereinafter referred to as the LESSEE, under terms and conditions listed below.

1. This lease term is for one crop of hemp (one "Growing Season"), commencing May 25, 2018 and ending at the end of the crop.

   Rent price          35 acres @ $400

2. The rent payment will be a total of $14,000.00 per Growing Season, payable as follows:

   July 15, 2018        $ 14,000.00

3. The LESSOR agrees to pay for all taxes and for water availability charges.

4. The LESSEE agrees to pay all charges for irrigation water and gate charges by the Imperial Irrigation District. The LESSEE further agrees to pay all costs in connection with the farming of the land, including all costs for producing, harvesting and delivering of the crops.  The LESSEE agrees to pay all costs for sprinkler and irrigation charges.

   a. LESSEE agrees to pay an additional $800 per acre for the following farming activities, including pre-planting and post-harvest activities, to be completed as directed by LESSEE:

        Disc
        Triplane
        List Beds
        Plant
        Apply herbicide/insecticide
        Apply fertilizer
        Irrigate
        Cultivate
        Spike
        Furrow
        Mulch

   Any further changes or fees must be authorized specifically in writing prior to any activities being performed or contracted.

LESSOR understands that this is a research project, and as such, cultivation practices and activities may not be consistent with standard farming practice.  To ensure the integrity of the research project, all cultivation activities must be authorized and directed by LESSEE in advance.

5. The LESSEE agrees to control all noxious weeds and rodents. Should a major washout occur along the drain ditch bank or any other place on the edge of the field,  the LESSEE agrees to repair the washout with dirt from someplace other than from the adjacent field or from the drain ditch bank.

6. The LESSEE covenants and agrees that he will hold the LESSOR harmless from any and all costs or expenses which may be incurred by reason of damage or personal injury to the LESSOR'S land, the LESSEE'S  employees, or any other person or property by reason of the use or activities carried on by the LESSEE on the leased premises.

7. It is agreed that should the LESSOR be compelled to commence an action at law to collect any rent or to dispossess the LESSEE, to recover possession of the land, or to enforce any terms of this lease, the LESSEE shall pay all costs in connection therewith including a reasonable attorney's fee. The LESSEE further agrees that in the event of his violation of any terms of this lease, the LESSOR may re-enter said premises and remove all persons therefrom, using all force necessary to do so and at the option of LESSOR to terminate this lease.

8. The LESSEE agrees, upon the expiration of this lease, to quit the property and surrender possession of it to the LESSOR in as good a condition as it was the first time he occupied it, reasonable and permitted use and damage of the elements accepted.

9. The terms, covenants and conditions contained in this lease shall bind the heirs, successors and assigns of both LESSOR and LESSEE.

THIS LEASE IS SIGNED AS OF _____6-19-18_____

FOR THE LESSEE:

IVCRC
4151 Highway 86
P O Box 1375
Brawley, CA 92227

FOR THE LESSOR:

Steve Dahm
P O Box 721

Brawley, CA 92227

# EXHIBIT 5



# Certificate of Analysis

| | |
|---|---|
| Sample Name: | IVRC 1 Field o  6-27-18 |
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y004 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Moisture Test Results

| | % | Action Limit % |
|---|---|---|
| Moisture | NT | |

## Cannabinoid Test Results                         07/23/2018

Cannabinoid analysis utilizing High Performance Liquid Chromatography (HPLC, QSP 5-4-4-4)

| | mg/g | % | LOD mg/g | LOQ mg/g |
|---|---|---|---|---|
| THC | ND | ND | 0.003 | 0.1 |
| THCa | 0.7 | 0.07 | 0.006 | 0.1 |
| CBD | 0.4 | 0.04 | 0.007 | 0.1 |
| CBDa | 10.2 | 1.02 | 0.005 | 0.1 |
| CBN | ND | ND | 0.003 | 0.1 |
| CBDV | ND | ND | 0.003 | 0.1 |
| CBDVa | 0.1 | 0.01 | 0.003 | 0.1 |
| CBG | ND | ND | 0.006 | 0.1 |
| CBGa | 0.3 | 0.03 | 0.004 | 0.1 |
| THCV | ND | ND | 0.005 | 0.1 |
| Δ8 - THC | ND | ND | 0.009 | 0.1 |
| CBC | ND | ND | 0.006 | 0.1 |

| | | |
|---|---|---|
| **Sum of Cannabinoids:** | **11.7** | **1.17** |
| Total THC (Δ9THC+0.877*THCa) | 0.6 | 0.06 |
| Total CBD (CBD+0.877*CBDa) | 9.3 | 0.93 |

## Terpene Test Results

Terpene analysis utilizing Gas Chromatography - Flame Ionization Detection (GC - FID)

| | mg/g / % | | mg/g / % |
|---|---|---|---|
| α Bisabolol | NT | α Terpinens | NT |
| α Pinene | NT | Linalool | NT |
| 3 Carene | NT | Limonene | NT |
| Borneol | NT | Myrcene | NT |
| β Caryophyllene | NT | Fenchol | NT |
| Geraniol | NT | α Phellandrens | NT |
| α Humulene | NT | Caryophyllene Oxide | NT |
| Terpinolene | NT | β Pinene | NT |
| Valencene | NT | R-(+)-Pulegone | NT |
| Menthol | NT | Geranyl Acetate | NT |
| Nerolidol | NT | Citronellol | NT |
| Camphene | NT | p-Cymene | NT |
| Eucalyptol | NT | Ocimene | NT |
| α Cedrene | NT | Guaiol | NT |
| Camphor | NT | Phytol | NT |
| (-)-Isopulegol | NT | Isoborneol | NT |
| Sabinene | NT | | |
| γ Terpinene | NT | | |
| Total Terpene Concentration: | | | NT |

## Residual Solvent Test Results

Residual Solvent analysis utilizing Gas Chromatography - Mass Spectrometry (GC - MS)

| | μg/g | Action Limit μg/g | LOD μg/g | LOQ μg/g |
|---|---|---|---|---|
| 1,2-Dichloroethane | NT | | | |
| Benzene | NT | | | |
| Chloroform | NT | | | |
| Ethylene Oxide | NT | | | |
| Methylene chloride | NT | | | |
| Trichloroethylene | NT | | | |
| Acetone | NT | | | |
| Acetonitrile | NT | | | |
| Butane | NT | | | |
| Ethanol | NT | | | |
| Ethyl acetate | NT | | | |
| Ethyl ether | NT | | | |
| Heptane | NT | | | |
| Hexane | NT | | | |
| Isopropyl Alcohol | NT | | | |
| Methanol | NT | | | |
| Pentane | NT | | | |
| Propane | NT | | | |
| Toluene | NT | | | |
| Total Xylenes | NT | | | |

## Microbiological Test Results

PCR and fluorescence detection of microbiological impurities

| | | Action Limit |
|---|---|---|
| Shiga toxin-producing Escherichia coli | NT | |
| Salmonella spp. | NT | |
| Aspergillus fumigatus | NT | |
| Aspergillus flavus | NT | |
| Aspergillus niger | NT | |
| Aspergillus terreus | NT | |

## Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018



# Certificate of Analysis

| | |
|---|---|
| Sample Name: | IVRC 1 Field o 6-27-18 |
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y004 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Pesticide Test Results

Pesticide, Fungicide and plant growth regulator analysis utilizing HPLC-Mass Spectrometry and GC-Mass Spectrometry

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| Abamectin | NT | | | |
| Acephate | NT | | | |
| Acequinocyl | NT | | | |
| Acetamiprid | NT | | | |
| Azoxystrobin | NT | | | |
| Bifenazate | NT | | | |
| Bifenthrin | NT | | | |
| Boscalid | NT | | | |
| Captan | NT | | | |
| Carbaryl | NT | | | |
| Chlorantraniliprole | NT | | | |
| Clofentezine | NT | | | |
| Cyfluthrin | NT | | | |
| Cypermethrin | NT | | | |
| Diazinon | NT | | | |
| Dimethomorph | NT | | | |
| Etoxazole | NT | | | |
| Fenhexamid | NT | | | |
| Fenpyroximate | NT | | | |
| Flonicamid | NT | | | |
| Fludioxonil | NT | | | |
| Hexythiazox | NT | | | |
| Imidacloprid | NT | | | |
| Kresoxim-methyl | NT | | | |
| Malathion | NT | | | |
| Metalaxyl | NT | | | |
| Methomyl | NT | | | |
| Myclobutanil | NT | | | |
| Naled | NT | | | |
| Oxamyl | NT | | | |
| Pentachloronitrobenzene | NT | | | |
| Permethrin | NT | | | |
| Phosmet | NT | | | |
| Piperonylbutoxide | NT | | | |
| Prallethrin | NT | | | |
| Propiconazole | NT | | | |
| Pyrethrins | NT | | | |
| Pyridaben | NT | | | |
| Spinetoram | NT | | | |
| Spinosad | NT | | | |
| Spiromesifen | NT | | | |
| Spirotetramat | NT | | | |
| Tebuconazole | NT | | | |
| Thiamethoxam | NT | | | |
| Trifloxystrobin | NT | | | |

## Pesticide Test Results

Pesticide, Fungicide and plant growth regulator analysis utilizing HPLC-Mass Spectrometry and GC-Mass Spectrometry

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| Aldicarb | NT | | | |
| Carbofuran | NT | | | |
| Chlordane | NT | | | |
| Chlorfenapyr | NT | | | |
| Chlorpyrifos | NT | | | |
| Coumaphos | NT | | | |
| Daminozide | NT | | | |
| DDVP (Dichlorvos) | NT | | | |
| Dimethoate | NT | | | |
| Ethoprop(hos) | NT | | | |
| Etofenprox | NT | | | |
| Fenoxycarb | NT | | | |
| Fipronil | NT | | | |
| Imazalil | NT | | | |
| Methiocarb | NT | | | |
| Methyl parathion | NT | | | |
| Mevinphos | NT | | | |
| Paclobutrazol | NT | | | |
| Propoxur | NT | | | |
| Spiroxamine | NT | | | |
| Thiacloprid | NT | | | |

## Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018



# Certificate of Analysis

| | |
|---|---|
| Sample Name: | IVRC 1 Field o  6-27-18 |
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y004 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Label Claim Test Results

### Cannabinoids

| Description | Claim | Actual | RPD | Fail Limit |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

### Terpenoids

| Description | Claim | Actual | RPD | Fail Limit |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

## Foreign Material Test Results

NT

## Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018


sclabs™
know your medicine

# Certificate of Analysis

| Sample Name: | IVRC 2 Field o 6-27-18 |
|---|---|
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y005 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| Date Collected: | 07/18/2018 |
|---|---|
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Moisture Test Results

| | % | Action Limit % |
|---|---|---|
| Moisture | NT | |

## Cannabinoid Test Results                          07/23/2018

Cannabinoid analysis utilizing High Performance Liquid Chromatography (HPLC, QSP 5-4-4-4)

| | mg/g | % | LOD mg/g | LOQ mg/g |
|---|---|---|---|---|
| THC | ND | ND | 0.003 | 0.1 |
| THCa | 0.1 | 0.01 | 0.006 | 0.1 |
| CBD | 0.2 | 0.02 | 0.007 | 0.1 |
| CBDa | 5.5 | 0.55 | 0.005 | 0.1 |
| CBN | ND | ND | 0.003 | 0.1 |
| CBDV | ND | ND | 0.003 | 0.1 |
| CBDVa | ND | ND | 0.003 | 0.1 |
| CBG | ND | ND | 0.006 | 0.1 |
| CBGa | <LOQ | <LOQ | 0.004 | 0.1 |
| THCV | ND | ND | 0.005 | 0.1 |
| Δ8 - THC | ND | ND | 0.009 | 0.1 |
| CBC | ND | ND | 0.006 | 0.1 |
| **Sum of Cannabinoids:** | **5.8** | **0.58** | | |
| Total THC (Δ9THC+0.877*THCa) | 0.1 | 0.01 | | |
| Total CBD (CBD+0.877*CBDa) | 5.0 | 0.5 | | |

## Residual Solvent Test Results

Residual Solvent analysis utilizing Gas Chromatography - Mass Spectrometry (GC - MS)

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| 1,2-Dichloroethane | NT | | | |
| Benzene | NT | | | |
| Chloroform | NT | | | |
| Ethylene Oxide | NT | | | |
| Methylene chloride | NT | | | |
| Trichloroethylene | NT | | | |
| Acetone | NT | | | |
| Acetonitrile | NT | | | |
| Butane | NT | | | |
| Ethanol | NT | | | |
| Ethyl acetate | NT | | | |
| Ethyl ether | NT | | | |
| Heptane | NT | | | |
| Hexane | NT | | | |
| Isopropyl Alcohol | NT | | | |
| Methanol | NT | | | |
| Pentane | NT | | | |
| Propane | NT | | | |
| Toluene | NT | | | |
| Total Xylenes | NT | | | |

## Terpene Test Results

Terpene analysis utilizing Gas Chromatography - Flame Ionization Detection (GC - FID)

| | mg/g / % | | mg/g / % |
|---|---|---|---|
| α Bisabolol | NT | α Terpinene | NT |
| α Pinene | NT | Linalool | NT |
| 3 Carene | NT | Limonene | NT |
| Borneol | NT | Myrcene | NT |
| β Caryophyllene | NT | Fenchol | NT |
| Geraniol | NT | α Phellandrene | NT |
| α Humulene | NT | Caryophyllene Oxide | NT |
| Terpinolene | NT | β Pinene | NT |
| Valencene | NT | R-(+)-Pulegone | NT |
| Menthol | NT | Geranyl Acetate | NT |
| Nerolidol | NT | Citronellol | NT |
| Camphene | NT | p-Cymene | NT |
| Eucalyptol | NT | Ocimene | NT |
| α Cedrene | NT | Guaiol | NT |
| Camphor | NT | Phytol | NT |
| (-)-Isopulegol | NT | Isoborneol | NT |
| Sabinene | NT | | |
| γ Terpinene | NT | | |
| **Total Terpene Concentration:** | | | NT |

## Microbiological Test Results

PCR and fluorescence detection of microbiological impurities

| | | Action Limit |
|---|---|---|
| Shiga toxin-producing Escherichia coli | NT | |
| Salmonella spp. | NT | |
| Aspergillus fumigatus | NT | |
| Aspergillus flavus | NT | |
| Aspergillus niger | NT | |
| Aspergillus terreus | NT | |

## Sample Certification


Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018



# Certificate of Analysis

| | |
|---|---|
| Sample Name: | IVRC 2 Field o 6-27-18 |
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y005 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Pesticide Test Results

Pesticide, Fungicide and plant growth regulator analysis utilizing HPLC-Mass Spectrometry and GC-Mass Spectrometry

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| Abamectin | NT | | | |
| Acephate | NT | | | |
| Acequinocyl | NT | | | |
| Acetamiprid | NT | | | |
| Azoxystrobin | NT | | | |
| Bifenazate | NT | | | |
| Bifenthrin | NT | | | |
| Boscalid | NT | | | |
| Captan | NT | | | |
| Carbaryl | NT | | | |
| Chlorantraniliprole | NT | | | |
| Clofentezine | NT | | | |
| Cyfluthrin | NT | | | |
| Cypermethrin | NT | | | |
| Diazinon | NT | | | |
| Dimethomorph | NT | | | |
| Etoxazole | NT | | | |
| Fenhexamid | NT | | | |
| Fenpyroximate | NT | | | |
| Flonicamid | NT | | | |
| Fludioxonil | NT | | | |
| Hexythiazox | NT | | | |
| Imidacloprid | NT | | | |
| Kresoxim-methyl | NT | | | |
| Malathion | NT | | | |
| Metalaxyl | NT | | | |
| Methomyl | NT | | | |
| Myclobutanil | NT | | | |
| Naled | NT | | | |
| Oxamyl | NT | | | |
| Pentachloronitrobenzene | NT | | | |
| Permethrin | NT | | | |
| Phosmet | NT | | | |
| Piperonylbutoxide | NT | | | |
| Prallethrin | NT | | | |
| Propiconazole | NT | | | |
| Pyrethrins | NT | | | |
| Pyridaben | NT | | | |
| Spinetoram | NT | | | |
| Spinosad | NT | | | |
| Spiromesifen | NT | | | |
| Spirotetramat | NT | | | |
| Tebuconazole | NT | | | |
| Thiamethoxam | NT | | | |
| Trifloxystrobin | NT | | | |

## Pesticide Test Results

Pesticide, Fungicide and plant growth regulator analysis utilizing HPLC-Mass Spectrometry and GC-Mass Spectrometry

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| Aldicarb | NT | | | |
| Carbofuran | NT | | | |
| Chlordane | NT | | | |
| Chlorfenapyr | NT | | | |
| Chlorpyrifos | NT | | | |
| Coumaphos | NT | | | |
| Daminozide | NT | | | |
| DDVP (Dichlorvos) | NT | | | |
| Dimethoate | NT | | | |
| Ethoprop(hos) | NT | | | |
| Etofenprox | NT | | | |
| Fenoxycarb | NT | | | |
| Fipronil | NT | | | |
| Imazalil | NT | | | |
| Methiocarb | NT | | | |
| Methyl parathion | NT | | | |
| Mevinphos | NT | | | |
| Paclobutrazol | NT | | | |
| Propoxur | NT | | | |
| Spiroxamine | NT | | | |
| Thiacloprid | NT | | | |

## Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018



# Certificate of Analysis

| | | | | |
|---|---|---|---|---|
| Sample Name: | IVRC 2 Field o 6-27-18 | | | |
| Lab Sample ID: | | | | |
| LIMS Sample ID: | 180718Y005 | | | |
| Batch #: | | | | |
| Sample Metrc ID: | | | | |
| Sample Type: | Flower, Inhalable | | | |
| Batch Weight: | | | | |
| Sample Weight: | | | | |
| Unit Mass: | | | | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Label Claim Test Results

### Cannabinoids
| Description | Claim | Actual | RPD | Fail Limit |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

### Terpenoids
| Description | Claim | Actual | RPD | Fail Limit |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

## Foreign Material Test Results

NT

## Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018



# Certificate of Analysis

| | |
|---|---|
| Sample Name: | DAHM Field 7-10-18 |
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y006 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Moisture Test Results

| | % | Action Limit % |
|---|---|---|
| Moisture | NT | |

## Cannabinoid Test Results                    07/23/2018

Cannabinoid analysis utilizing High Performance Liquid Chromatography (HPLC, QSP 5-4-4-4)

| | mg/g | % | LOD mg/g | LOQ mg/g |
|---|---|---|---|---|
| THC | ND | ND | 0.003 | 0.1 |
| THCa | 0.9 | 0.09 | 0.006 | 0.1 |
| CBD | ND | ND | 0.007 | 0.1 |
| CBDa | 1.8 | 0.18 | 0.005 | 0.1 |
| CBN | ND | ND | 0.003 | 0.1 |
| CBDV | ND | ND | 0.003 | 0.1 |
| CBDVa | 1.3 | 0.13 | 0.003 | 0.1 |
| CBG | ND | ND | 0.006 | 0.1 |
| CBGa | ND | ND | 0.004 | 0.1 |
| THCV | ND | ND | 0.005 | 0.1 |
| Δ8 - THC | ND | ND | 0.009 | 0.1 |
| CBC | ND | ND | 0.006 | 0.1 |

| | | |
|---|---|---|
| **Sum of Cannabinoids:** | **4.0** | **0.4** |
| Total THC (Δ9THC+0.877*THCa) | 0.8 | 0.08 |
| Total CBD (CBD+0.877*CBDa) | 1.6 | 0.16 |

## Residual Solvent Test Results

Residual Solvent analysis utilizing Gas Chromatography - Mass Spectrometry (GC - MS)

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| 1,2-Dichloroethane | NT | | | |
| Benzene | NT | | | |
| Chloroform | NT | | | |
| Ethylene Oxide | NT | | | |
| Methylene chloride | NT | | | |
| Trichloroethylene | NT | | | |
| Acetone | NT | | | |
| Acetonitrile | NT | | | |
| Butane | NT | | | |
| Ethanol | NT | | | |
| Ethyl acetate | NT | | | |
| Ethyl ether | NT | | | |
| Heptane | NT | | | |
| Hexane | NT | | | |
| Isopropyl Alcohol | NT | | | |
| Methanol | NT | | | |
| Pentane | NT | | | |
| Propane | NT | | | |
| Toluene | NT | | | |
| Total Xylenes | NT | | | |

## Terpene Test Results

Terpene analysis utilizing Gas Chromatography - Flame Ionization Detection (GC - FID)

| | mg/g / % | | mg/g / % |
|---|---|---|---|
| α Bisabolol | NT | α Terpinene | NT |
| α Pinene | NT | Linalool | NT |
| 3 Carene | NT | Limonene | NT |
| Borneol | NT | Myrcene | NT |
| β Caryophyllene | NT | Fenchol | NT |
| Geraniol | NT | α Phellandrene | NT |
| α Humulene | NT | Caryophyllene Oxide | NT |
| Terpinolene | NT | Terpineol | NT |
| Valencene | NT | β Pinene | NT |
| Menthol | NT | R-(+)-Pulegone | NT |
| Nerolidol | NT | Geranyl Acetate | NT |
| Camphene | NT | Citronellol | NT |
| Eucalyptol | NT | p-Cymene | NT |
| α Cedrene | NT | Ocimene | NT |
| Camphor | NT | Guaiol | NT |
| (-)-Isopulegol | NT | Phytol | NT |
| Sabinene | NT | Isobomeol | NT |
| γ Terpinene | NT | | |

| | |
|---|---|
| **Total Terpene Concentration:** | NT |

## Microbiological Test Results

PCR and fluorescence detection of microbiological impurities

| | | Action Limit |
|---|---|---|
| Shiga toxin-producing Escherichia coli | NT | |
| Salmonella spp. | NT | |
| Aspergillus fumigatus | NT | |
| Aspergillus flavus | NT | |
| Aspergillus niger | NT | |
| Aspergillus terreus | NT | |

## Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018



# Certificate of Analysis

| | |
|---|---|
| Sample Name: | DAHM Field 7-10-18 |
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y006 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Pesticide Test Results

Pesticide, Fungicide and plant growth regulator analysis utilizing HPLC-Mass Spectrometry and GC-Mass Spectrometry

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| Abamectin | NT | | | |
| Acephate | NT | | | |
| Acequinocyl | NT | | | |
| Acetamiprid | NT | | | |
| Azoxystrobin | NT | | | |
| Bifenazate | NT | | | |
| Bifenthrin | NT | | | |
| Boscalid | NT | | | |
| Captan | NT | | | |
| Carbaryl | NT | | | |
| Chlorantraniliprole | NT | | | |
| Clofentezine | NT | | | |
| Cyfluthrin | NT | | | |
| Cypermethrin | NT | | | |
| Diazinon | NT | | | |
| Dimethomorph | NT | | | |
| Etoxazole | NT | | | |
| Fenhexamid | NT | | | |
| Fenpyroximate | NT | | | |
| Flonicamid | NT | | | |
| Fludioxonil | NT | | | |
| Hexythiazox | NT | | | |
| Imidacloprid | NT | | | |
| Kresoxim-methyl | NT | | | |
| Malathion | NT | | | |
| Metalaxyl | NT | | | |
| Methomyl | NT | | | |
| Myclobutanil | NT | | | |
| Naled | NT | | | |
| Oxamyl | NT | | | |
| Pentachloronitrobenzene | NT | | | |
| Permethrin | NT | | | |
| Phosmet | NT | | | |
| Piperonylbutoxide | NT | | | |
| Prallethrin | NT | | | |
| Propiconazole | NT | | | |
| Pyrethrins | NT | | | |
| Pyridaben | NT | | | |
| Spinetoram | NT | | | |
| Spinosad | NT | | | |
| Spiromesifen | NT | | | |
| Spirotetramat | NT | | | |
| Tebuconazole | NT | | | |
| Thiamethoxam | NT | | | |
| Trifloxystrobin | NT | | | |

## Pesticide Test Results

Pesticide, Fungicide and plant growth regulator analysis utilizing HPLC-Mass Spectrometry and GC-Mass Spectrometry

| | µg/g | Action Limit µg/g | LOD µg/g | LOQ µg/g |
|---|---|---|---|---|
| Aldicarb | NT | | | |
| Carbofuran | NT | | | |
| Chlordane | NT | | | |
| Chlorfenapyr | NT | | | |
| Chlorpyrifos | NT | | | |
| Coumaphos | NT | | | |
| Daminozide | NT | | | |
| DDVP (Dichlorvos) | NT | | | |
| Dimethoate | NT | | | |
| Ethoprop(hos) | NT | | | |
| Etofenprox | NT | | | |
| Fenoxycarb | NT | | | |
| Fipronil | NT | | | |
| Imazalil | NT | | | |
| Methiocarb | NT | | | |
| Methyl parathion | NT | | | |
| Mevinphos | NT | | | |
| Paclobutrazol | NT | | | |
| Propoxur | NT | | | |
| Spiroxamine | NT | | | |
| Thiacloprid | NT | | | |

## Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018



# Certificate of Analysis

| | |
|---|---|
| Sample Name: | DAHM Field 7-10-18 |
| Lab Sample ID: | |
| LIMS Sample ID: | 180718Y006 |
| Batch #: | |
| Sample Metrc ID: | |
| Sample Type: | Flower, Inhalable |
| Batch Weight: | |
| Sample Weight: | |
| Unit Mass: | |

| | |
|---|---|
| Date Collected: | 07/18/2018 |
| Date Received: | 07/18/2018 |
| Tested for: | Farmtiva |
| License #: | |
| Address: | CA 92651 |
| Produced by: | |
| License #: | |
| Address: | |
| Overall result for batch: | |

## Label Claim Test Results

### Cannabinoids

| Description | Claim | Actual | RPD | Fail Limit |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

### Terpenoids

| Description | Claim | Actual | RPD | Fail Limit |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

## Foreign Material Test Results

NT

### Sample Certification



Scan to verify at sclabs.com

Josh Wurzer, President
Date: 07/23/2018

# EXHIBIT 6

1  ADAM L. BRAVERMAN
   United States Attorney
2  BRETT NORRIS
   Assistant U.S. Attorney
3  Cal. State Bar No. 224875
   PAUL L. STARITA
4  Assistant U.S. Attorney
   Cal. State Bar No. 219573
5  Office of the U.S. Attorney
   880 Front Street, Room 6293
6  San Diego, CA 92101-8893
   Telephone: (619) 546-7620/7701
7  Facsimile: (619) 546-7751
   Email: brett.norris@usdoj.gov
8  Email: paul.starita@usdoj.gov

9  Attorneys for Plaintiff
   UNITED STATES OF AMERICA
10

11          UNITED STATES DISTRICT COURT

12          SOUTHERN DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,          Case No.:

14                  Plaintiff,         **DECLARATION OF**

15       vs.                           **Matthew Argandona**

16  JAMES WOOD, an individual;
    IMPERIAL VALLEY CONSERVATION
17  RESEARCH CENTER, a California
    Corporation; CHRISTOPHER
18  BOUCHER, an individual; FARMTIVA
    INC., a California corporation; COUNTY
19  OF IMPERIAL, a political subdivision of
    the State of California; STEVEN DAHM,
20  an individual; and DOES 1 THROUGH
    100,
21
                    Defendants.
22

23  I, Matthew Argandona, hereby declare as follows:

24       1.    I am a Task Force Officer (TFO) with the United States Drug Enforcement

25  Administration ("DEA"), in the above-captioned action.  I have first-hand knowledge of

26  the statements contained in this Declaration.

27

28
                                1

2.      The Imperial Valley Conservation Research Center was cultivating Industrial Hemp from May 2018 until October 2018, in fields owned by Imperial County and Steve Damn within the city limits of Brawley, California.

3.      On August 8, 2018, TFO Argandona traveled to Johnson Road and Forrester Road in Brawley, California, farmland owned by Steve Dahm and leased by The Imperial Valley Conservation Research Center.  TFO Argandona observed at the southwest corner field 'No Trespassing' signs erected.  The signs indicated the field was an Industrial Hemp crop and not marijuana and contained 0% THC (Tetrahydrocannabinol).

4.      Task Force Officer Matthew Argandona examined the field and saw the field was growing multiple rows of plant material which appeared similar to the Cannabis Sativa plant species.

5.  On the same date, TFO Argandona traveled to the second location at 4151 Highway 86, Brawley, California.   This land is operated by The Imperial Valley Conservation Research Center.   TFO Argandona observed the same "No Trespassing' signs and wording indicating the field was an Industrial Hemp crop and not marijuana and contained 0% THC (Tetrahydrocannabinol).

6.      Task Force Officer Matthew Argandona examined the field and saw the field was growing multiple rows of plant material which appeared similar to the Cannabis Sativa plant species.

7.      On October 12, 2018, I observed that the hemp was harvested.  Both fields were clear of all plant material.

Executed on October 19, 2018, at Brawley, California

Matthew Argandona, Task Force Officer

2

# EXHIBIT 7

1   ADAM L. BRAVERMAN
    United States Attorney
2   BRETT NORRIS
    Assistant U.S. Attorney
3   Cal. State Bar No. 224875
    PAUL L. STARITA
4   Assistant U.S. Attorney
    Cal. State Bar No. 219573
5   Office of the U.S. Attorney
    880 Front Street, Room 6293
6   San Diego, CA 92101-8893
    Telephone: (619) 546-7620/7701
7   Facsimile: (619) 546-7751
    Email: brett.norris@usdoj.gov
8   Email: paul.starita@usdoj.gov

9   Attorneys for Plaintiff
    UNITED STATES OF AMERICA
10

11              UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,          Case No.:

14                    Plaintiff,       **DECLARATION OF TIMOTHY
                                       MENINO**
15        vs.

16  JAMES WOOD, an individual;
    IMPERIAL VALLEY CONSERVATION
17  RESEARCH CENTER, a California
    Corporation; CHRISTOPHER
18  BOUCHER, an individual; FARMTIVA
    INC., a California corporation; COUNTY
19  OF IMPERIAL, a political subdivision of
    the State of California; STEVEN DAHM,
20  an individual; and DOES 1 THROUGH
    100,
21
22                    Defendants.

23  I, Timothy Menino, hereby declare as follows:

24        1.    I am a Special Agent with the United States Drug Enforcement

25  Administration ("DEA").  I have first-hand knowledge of the statements contained in this

26  Declaration.

27

28
                              1

2.      The DEA maintains a data-base that tracks all applications and approvals of DEA registrations handling controlled substances in Schedules I through V.  The database is the Registrant Information Consolidated System (RICS).

3.      On October 18, 2018, I witnessed a DEA Diversion Investigator search RICS. That search revealed that none of the Defendants in this action (James Wood, Imperial Valley Conservation Research Center, Christopher Boucher, Farmtiva Inc., County of Imperial, and Steve Dahm) have a pending application or obtained a certificate of registration from the DEA.  Accordingly, none of the Defendants in this action are permitted to manufacture, distribute, or possess any Schedule I through V controlled substances.

Executed on October 19, 2018, at San Diego, California.

Timothy Menino, DEA Special Agent